512 A.2d 1056

**Kirk Noble BLOODSWORTH**

v.

**STATE of Maryland.**

**No. 71, Sept. Term, 1985.**

Court of Appeals of Maryland.

July 29, 1986.

Motion for Reconsideration Denied Sept. 3, 1986.

Julia Doyle Bernhardt and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before SMITH, ELDRIDGE, COLE, RODOW-SKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

SMITH, Judge.

Appellant, Kirk Noble Bloodsworth, was convicted by a Baltimore County jury of first degree murder, first degree rape, and first degree sexual offense. The trial judge subsequently determined that he should be sentenced to death.

The case reaches us pursuant to the provisions of Maryland Code (1957, 1982 Repl. Vol.) Art. 27, § 414 stating that whenever the death penalty is imposed, we shall review the sentence.

We shall reverse the conviction and remand for a new trial because we find a violation of Bloodsworth's rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## I SUFFICIENCY OF THE EVIDENCE

■ Bloodsworth challenges the sufficiency of the evidence to convict. We first address that issue because if there were insufficient evidence to convict there could be no new trial.

The applicable standard is whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The standard is derived from *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Branch v. State,* 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986); *State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720, 725 (1981); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). We summarize the evidence connecting Bloodsworth with the crime.

A bloody rock was found at the scene where the body was discovered. There was testimony that no mention of the rock was made in the press releases. It was established that there was human blood on the rock.

Bloodsworth was identified by individuals other than young Christian Shipley and his companion, Jackie Poling, as being in the area before, during, and after the occurrence. Shipley said he and Jackie went fishing at a local pond. While they were there a man came down the path and stopped by to look at the turtle Jackie had caught. Shortly thereafter Dawn Hamilton, the victim, came by and said she was looking for her cousin, Lisa. The boys refused to help her find Lisa. However, the man agreed to help and walked off with Dawn.

Young Shipley provided a description for a composite picture of the man in question. He later picked out a person in a photoarray said by him to be the man at the pond. Later testimony confirmed this photo to be one of Bloodsworth. At a police line-up Shipley identified the man in the number six position as the person he saw go off with

Dawn. The man in the number six position was identified in court as Bloodsworth.

Jackie Poling said he saw a man coming down the path but could not remember what he was wearing or what he looked like. He did testify that Dawn came to the pond looking for her cousin and left the pond with the man. He then testified that he went to the police station where he attended a line-up at which he picked out the wrong person because he was scared. When he left the line-up room he stated to his mother that he had picked out the wrong man because he was scared. He told his mother who the correct person was. That person was the individual in the number six position at the line-up. Because of Jackie's inability to remember what had occurred, the State introduced his statement taken the day of the murder and the statement he made after the line-up identification. The first statement corroborated his testimony and gave a description of the man. The second statement identified the person in the number six position as the individual he saw at the pond. Jackie's mother corroborated her son's testimony.

Donna Ferguson, a resident of the area, testified that she saw Dawn at approximately 10:30 a.m. talking to a man by a fence leading into the woods. She gave a description. She attended a police line-up where she picked out the person in the number six position as the man she had seen talking to Dawn. She made an in-court identification of Bloodsworth as the individual she had picked out of the line-up.

Detective Capel testified that he responded to a missing person's call placed by Bloodsworth's wife which led him eventually to his initial meeting with Bloodsworth in Cambridge. At that time he took a Polaroid photograph of Bloodsworth which he later inserted in the number four position in an array of six photographs shown to Jackie Poling and Chris Shipley. Capel testified that Poling did not identify Bloodsworth but that Shipley did identify him in

the photoarray as the man he had seen with Dawn at the pond. The photoarray was introduced into evidence.

Detective Capel testified that he returned to Cambridge with a warrant for Bloodsworth's arrest and placed him under arrest. During an initial interview Capel took out a pair of white panties and placed them in front of Bloodsworth. He said Bloodsworth reacted to this by claiming that he did not hurt the girl and Bloodsworth also mentioned a bloody rock. The detective testified that only a few officers and the murderer knew about the rock and Bloodsworth was unable to explain his knowledge. Capel corroborated the line-up identifications of Bloodsworth by Poling, Shipley, Donna Ferguson, and two other individuals who said they had seen Bloodsworth in the neighborhood. He also identified the line-up photograph showing Bloodsworth in the number six position and the photoarray with him in the number four position.

Tina Christopher testified as to a conversation she had with Bloodsworth at Cambridge in which he talked about a little girl and clothing. She indicated that he said something happened to this little girl and the police had accused him of killing her. She recalled his discussing a bloody rock, light blue shorts and white top, and some other man who was with him who took the little girl off into the woods. Later in her testimony she again described a conversation with Bloodsworth immediately after he returned from the police station. At that time he discussed the girl, her clothes, the bloody rock, and a man who was with him who he claimed was supposed to have done the crime. Because of her inability to clearly remember the details of the situation, her statement to the police made at the time was also introduced into evidence and is discussed in Part 6 of this opinion (Past Recollection Recorded). The statement said in relevant part:

"Q. When Kirk came in and started talking, what did he say to you?

"A. He was talking about ... it was bits and pieces. I thought he was talking about his daughter. He starting

talking about this little girl and her clothes and a beach. Something about a rock ... I didn't pay too much attention to him. Finally he started putting it all together. He said that him and someone else were down there talking with this little girl and boy, and the guy was with him said something to the little girl. The guy did something and the little girl ask him to help her find somebody. Then he said this guy went with the girl and then he stopped talking. I asked him who the guy was and he would not tell me. Then he come up with this little girl and talking about her again. It was like he was talking in a daze. He described her clothes and a rock that was suppose to be bloody. He said she was wearing a pair of light blue shorts and a white top and he said something again about a rock that was suppose to be bloody. Then he left and me and Tina and Bobby left. It was awhile and then he came back. Me and Tina were sitting in the living room and he was telling us that some officer took him down the police station and took pictures of them and he saw what was suppose to be the girls clothes and the rock laying beside them and he asked the officer was that the little girls clothes. When he got done telling us bits and pieces of that story, he kept asking me and Tina were we scared of him. I told him I don't know. That's about it.... He said if you are scared of me you don't have any reason to be, cause I did not do it. I don't know what he meant by that."

The State's final witness was Rose Carson of Cambridge at whose home Bloodsworth stayed while he was in Cambridge. She said that he told her he had done something bad, that he was afraid his wife was not going to take him back, and that he hoped to get admitted to the State hospital.[1] He also told her he was suspected of killing and raping a little girl.

---

**1.** One of the State mental hospitals is located on the outskirts of Cambridge.

The evidence, as Bloodsworth points out, is almost entirely circumstantial, but, as Judge Henderson said for the Court in *Breeding v. State*, 220 Md. 193, 198, 151 A.2d 743, 746 (1959), "that is not a fatal objection." See also *Veney v. State*, 251 Md. 182, 201, 246 A.2d 568, 579 (1968). We think a rational trier of fact could have found beyond a reasonable doubt that Bloodsworth committed the crimes.

## II THE BRADY VIOLATION

Bloodsworth filed a discovery motion which, in addition to a general request for all exculpatory material, requested "the names, addresses, and physical descriptions of any persons other than the defendant who were arrested or otherwise taken into custody by police or prosecution officials as a possible suspect in this case in which the defendant is charged." Later he requested production by the State of "any and all information of which it is aware including but not limited to line-ups, photospreads, or reports to law enforcement authorities, identifying or suggesting that someone other than the Defendant ... was the perpetrator of this crime." He also requested the production of the notes of all police officers with respect to the case.

As Bloodsworth puts it:

"Limited information was produced by the prosecution concerning a Richard Gray. Based on the limited information supplied, the defense was able to elicit some testimony at trial casting suspicion on Gray. Gray, a newspaper deliverer, was discovered wandering in the woods in the vicinity of the crime shortly before the victim's body was found. He was wearing green camouflage fatigues and carrying a policeman's billy club. Gray directed the father of the victim to the victim's underwear which was hanging in the woods from a tree branch. Another pair of lady's underwear was found in the back seat of Gray's car during a consensual search. The police eliminated Gray as a suspect in the case based on interviews." (References to transcript pages omitted.)

On the basis of *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Bloodsworth takes issue with the State's failure to provide the defense with a copy of a confidential report by Detective Mark Bacon. This report concluded with Bacon's "opinion that Mr. Gray has a great deal more information than he [is] releasing to us at this time, and as a result of this I feel that he should not be overlooked as a possible suspect in the above offense."

■ The report in question in some manner reached the hands of Bloodsworth's counsel between the guilt-innocence phase of the trial and the sentencing phase. Where it was in the interim we do not know. It and testimony from Detective Bacon were the subject of a motion for new trial on the basis of newly discovered evidence. At that time the State informed the court that the prosecution had never had a copy of the confidential report. The assistant State's attorney said that he had:

"opened up all of the police notebooks, of which there were some 4 huge notebook binders containing all the tips and information received, I think some 513 in number.... These files contain information regarding all the phone calls received, all the suspects developed. There were photographs included. There were rap sheets. [Defense counsel] had to spend a whole day going through all of these things in our office in this building."

The prosecutors also noted that the indictment listed Gray as a State's witness and provided his address. Of course, the fact that the prosecutors were not in physical possession of the report is immaterial. *See United States v. Bagley*, 473 U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342, 353 (1976); *State v. Giles*, 239 Md. 458, 470, 212 A.2d 101, 108 (1985), *vacated and remanded on other grounds*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

■ At the hearing on the motion for new trial Detective Bacon was produced as a witness. By that time he had

retired from the Baltimore County Police Department. He said his last duty was as a child abuse investigator. He related a call in regard to a search for a missing 9 year old white female. He testified that he was one of the officers who discovered the body of the victim in this case. He had occasion to come upon a person by the name of Richard Gray. Bloodsworth presents in his brief a fair summary of the Bacon testimony:

"When Bacon discovered Gray in the woods, Gray was very dirty except for his hands which were meticulously clean. A red spot that looked like blood was on Gray's shirt. Gray appeared quite nervous and vomited during or immediately after the search of his car. The under-wear found in Gray's car was that of a small girl. Gray's explanation of the presence of the underwear was that he had found them in the woods a couple days earlier and was intending to take them home for his wife or daugh-ter. Even before the victim was found, Gray referred to her pocketbook and gestured around his left shoulder to indicate that it was a shoulder bag. When the victim's body was found, there was a shoulder bag with the strap over her left shoulder as indicated by Gray. Before Gray could even know that the body was found, he told Detec-tive Bacon that he hoped 'they get him' and 'bring him to justice,' and that he hated to see people 'abuse' little children. Bacon ran a check on Gray and found that he had a criminal conviction for indecent exposure and had been arrested for burglary. Bacon discovered some time later that Gray failed a police-administered polygraph examination in connection with this case." (References to transcript pages omitted.)

Bacon testified that he took a statement from Gray. That statement, apparently not disclosed to defense counsel prior to trial, was read by Bacon at the hearing on the motion for new trial. Bacon said he was dissuaded by his superiors from further investigation of Gray. On the subject of the cleanliness of Gray's hands, Bacon stated:

"[T]here was approximately 30 to 40 newspapers that were rolled on the front seat of the car, which once again is inconsistent with Mr. Gray's hands being cleaned. Someone who had rolled 30 or 40 newspapers is going to have some black from the newspapers on his hands, and they are not going to be as clean as his were."

In *Brady*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Court said:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

Brady and a companion, Boblit, were found guilty of murder in the first degree and were sentenced to death. The Supreme Court summarized the facts:

"Their trials were separate, petitioner being tried first. At his trial Brady took the stand and admitted his participation in the crime, but he claimed that Boblit did the actual killing. And, in his summation to the jury, Brady's counsel conceded that Brady was guilty of murder in the first degree, asking only that the jury return that verdict 'without capital punishment.' Prior to the trial petitioner's counsel had requested the prosecution to allow him to examine Boblit's extrajudicial statements. Several of those statements were shown to him; but one dated July 9, 1958, in which Boblit admitted the actual homicide, was withheld by the prosecution and did not come to petitioner's notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed." 373 U.S. at 84, 83 S.Ct. at 1195, 10 L.Ed.2d at 217.

On appeal from a denial of post-conviction relief, this Court said in *Brady v. State*, 226 Md. 422, 174 A.2d 167 (1961):

"We think that there was a duty on the State to produce the confession of Boblit that he did the actual strangling or at least to inform counsel for the accused of

its existence. The suppression or withholding by the State of material evidence exculpatory to an accused is a violation of due process." 226 Md. at 427, 174 A.2d at 169.

Chief Judge Brune concluded for the Court "that the withholding of this particular confession of Boblit's was prejudicial to the defendant Brady ... and that he was deprived of a constitutional right...." 226 Md. at 430, 174 A.2d at 171.

Last year in *United States v. Bagley*, 473 U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court set forth the test to be applied to an evaluation of *Brady* material. In the opinion of Justice Blackmun, joined by Justice O'Connor, the test is stated:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at ——, 105 S.Ct. at 3384, 87 L.Ed.2d at 495.

Justice White, in a concurring opinion joined by the Chief Justice and Justice Rehnquist, said he agreed with this statement. 473 U.S. at ——, 105 S.Ct. at 3385, 87 L.Ed.2d at 496.

In *Brady*, 226 Md. at 430, 174 A.2d at 171, Chief Judge Brune said for the Court, "Not without some doubts, we conclude that the withholding of this particular confession of Boblit's was prejudicial to the defendant Brady." We have some doubts in this case. Had defense counsel had this report before trial and not followed up upon it we undoubtedly would be met with a claim of ineffective assistance of counsel for failure to investigate. *See, e.g., State v. Calhoun*, 306 Md. 692, 511 A.2d 461 (1986); *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986); and *Harris v. State*, 303 Md. 685, 496 A.2d 1074 (1985). All factors considered we conclude that the undisclosed report is suffi-

cient to undermine confidence in the outcome of the trial. Hence, there must be a new trial.

## III

Bloodsworth raises several contentions which, in the light of the fact that we are remanding the case for a new trial, we are not obliged to decide. However, in the interest of judicial economy we shall address certain of them for the guidance of the trial judge upon the remand.

## A. THE FOOTWEAR

The Medical Examiner's report said, among other things:

"In the lower part of the neck in the front there was a patterned mark, an abrasion that went across the front of the lower neck. It had a somewhat herringbone appearance. A similar pattern was also seen in the back of the neck at the lower part where the muscles of the shoulders come together at the lower part of the neck."

This served to create an area of contention in this case.

Bloodsworth says:

"Over repeated objections by defense counsel, the prosecution introduced evidence comparing shoeprints from a pair of tennis shoes which the prosecution claimed belonged to Appellant with photographs purporting to show marks inflicted upon the victim's body. The evidence should not have been admitted because the prosecution witness was not qualified as an expert, a proper foundation for the use and admission of the photographs was not laid, the method of comparison used was not shown to be reliable or generally accepted in the field, the tennis shoes were not shown to belong to or have been worn by Appellant, and the shoe prints were not sufficiently distinct to permit a valid comparison."

Bloodsworth introduced evidence from an expert to the effect that the seized shoes in question were five half sizes too small for Bloodsworth.

The evidence was such that the State was forced in closing argument to concede that the shoeprint evidence "does not point to the Defendant, and we candidly admit that to you all, but neither does it eliminate him, nor does it point to anyone else. It is just neutral evidence." In this circumstance we doubt that this evidence will be introduced on the remand.

## B. EYEWITNESS IDENTIFICATION

Bloodsworth takes exception to the refusal of the trial court to permit testimony on the issue of eyewitness identification from Dr. Robert Buckhout, a professor of psychology in the City University of New York at Brooklyn College.

Nowhere in Bloodsworth's statement of facts, his brief, or the actual testimony of Dr. Buckhout are we provided with a summary of just what he intended to prove by this expert testimony. The nearest one can come to it is the answer given to the trial judge at the conclusion of direct and cross-examination:

"THE COURT: I'm trying to find out what basically you would say. Would you be conveying to the jury the unreliableness of eye-witness testimony?

"THE WITNESS: We would only, I would only be estimating what the research shows. I don't have a particularly overall general condemnation of eye witnesses at issue. That has never been a factor at all.

"My belief and sort of underlying theory is that eye witnesses are really confronted with a difficult situation, and when the circumstances add up to a very difficult challenge to the memory system, these are the things that can happen to various parts of their testimony and various parts of their identification, and testing methods, of course, is one of the areas that I have done most of my work on, and the testing method again I see as simply a tool, and the checklist is simply to provide to the jury, or elements of the checklist are provided to the jury so that

they can essentially assess what, at least, the filter of the scientist would say about a given test.

"In some states I have been asked, in fact, I was pushed in one case fairly recently to give an opinion on the line-up or the photo spreads in evidence. Your Honor, forgive me if I must be very honest to say that I don't know how far Maryland law, as opposed to other law, would permit that type of testimony to go, but I think still that that would be merely advisory. I would only look on the test simply as a tool and nothing more."

In excluding this testimony the trial judge said:

"I am concerned that the possibility of admitting the evidence would tend to confuse or mislead the jury. This is not just a matter of usurping the province of the jury, although it is in my judgment most certainly that, it is also that such testimony is of little value in aiding the jury in this case. I'm not persuaded that the testimony will be helpful to the jury in understanding the evidence in this case."

The trial judge regarded the standard for admissibility to be, as we held in *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 368 (1978), as set forth in *Frye v. United States*, 293 Fed. 1013, 1014 (D.C.Cir.1923), that is whether it is generally accepted as reliable within the expert's particular scientific field. As indicated, however, he did not confine himself to that in his rejection. He further said:

"It seems to me that the reliability of the witnesses and the identification witnesses is better tested by the cathartic effect of cross-examination than by the opinion of an expert. The expert has not heard the testimony as it came from the witnesses on the witness stand under oath, nor has he had the opportunity to view them, to observe their demeanor and the manner of testifying. The jury has.

"As you all know, when the court instructs the jury, included in those instructions is a number of suggestions of what the jury ought to be looking for and how the jury

should test the credibility of the witness, whether or not the testimony is reliable.

"For two reasons: One the failure of the defense to persuade this Court that the technique has general acceptance in the relevant scientific community. It utterly fails in that respect, and this Court is bound by the decision of the Court of Appeals in *Reed v. State* and subsequent cases that say that the threshold question shall be determined by the application of the *Frye* standard.

"Beyond that, even if it were a technique generally accepted in the relevant scientific community, the proffer is not sufficient to persuade me first, exactly what is even being offered to the jury other than some generalized explanation of the studies that have been made. Nothing that has been proffered suggests that it will be helpful.

"It will be helpful but causes me to be concerned that it may usurp the jury's province in determining the reliability of the identification in this case, so on both counts, the Defendant has failed to make a case for the use of Doctor Buckhout's testimony in this case. The motion in limine is granted."

There is a split of authority around the country relative to admissibility of evidence such as that of Dr. Buckhout here. Much of this proffered evidence consists of testimony from Dr. Buckhout or his associate in experimentations, Elizabeth Loftus.

Bloodsworth relies heavily on *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). That court rejected the *Frye* test, saying it "suffers from serious flaws" and "has proved to be too malleable to provide the method for orderly and uniform decision-making envisioned by some of its proponents." It observed that "in its pristine form the general acceptance standard reflects a conservative approach to the admissibility of scientific evidence that is at odds with the spirit, if not the precise language, of the Federal Rules of

Evidence." *Id.* at 1237. The court referred to Fed.R.Evid. 702:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The Third Circuit then proceeded to lay down its own rules for testing such evidence, which it summarized at the outset of its opinion:

> "First, the evidence must survive preliminary scrutiny in the course of an in limine proceeding conducted by the district judge. This threshold inquiry, which we derive from the helpfulness standard of Rule 702, is essentially a balancing test, centering on two factors: (1) the reliability of the scientific principles upon which the expert testimony rests, hence the potential of the testimony to aid the jury in reaching an accurate resolution of a disputed issue; and (2) the likelihood that introduction of the testimony may in some way overwhelm or mislead the jury. Second, admission depends upon the 'fit,' i.e., upon a specific proffer showing that scientific research has established that particular features of the eyewitness identifications involved may have impaired the accuracy of those identifications. The district court's assessment of these factors will guide its discretion in deciding whether to admit the evidence under Fed. R. Evid. 702, which contemplates a liberal view toward the admissibility of expert testimony generally. The district court's ruling under Fed. R. Evid. 702 will be reviewable under an abuse of discretion standard. Finally, the district court retains discretionary authority under Fed. R. Evid. 403 to exclude any relevant evidence that would unduly waste time or confuse the issues at trial." 753 F.2d at 1226.

It remanded the case for an evidentiary hearing in the trial court concerning the admissibility of the proffered expert

testimony. What Bloodsworth does not tell us is that on the remand, *United States v. Downing*, 609 F.Supp. 784 (E.D.Pa.), *aff'd mem.*, 780 F.2d 1017 (3d Cir.1985), the trial court refused to permit the evidence of Dr. Buckhout, saying:

"It is perhaps in establishing the 'fit' between the scientific research presented by Dr. Buckhout and the disputed factual issues of this case that defendant's argument for the admission of expert testimony is weakest." 609 F.Supp. at 792.

It reinstated the conviction.

Cases in which expert testimony on eyewitness identification has been approved include *United States v. Smith*, 736 F.2d 1103 (6th Cir.), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984); *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986).

The vast majority of courts have rejected such evidence. *See, e.g., United States v. Brewer*, 783 F.2d 841 (9th Cir. 1986); *Rodriguez v. Wainwright*, 740 F.2d 884 (11th Cir. 1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985); *United States v. Purham*, 725 F.2d 450 (8th Cir.1984); *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982); *United States v. Fosher*, 590 F.2d 381 (1st Cir.1979); *United States v. Watson*, 587 F.2d 365 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979); *United States v. Brown*, 540 F.2d 1048 (10th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. Brown*, 501 F.2d 146 (9th Cir.1974), *rev'd on other grounds sub nom. United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973); *Caldwell v. State*, 267 Ark. 1053, 594 S.W.2d 24 (1980); *People v. Lawson*, 37 Colo.App. 442, 551 P.2d 206 (1976); *Taylor v. United States*, 451 A.2d 859 (D.C.App.1982), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983); *Nelson v. State*, 362 So.2d 1017 (Fla.Dist.Ct.App.1978); *State v.*

*Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983); *People v. Clark,* 124 Ill.App.3d 14, 79 Ill.Dec. 427, 463 N.E.2d 981 (1984); *State v. Stucke,* 419 So.2d 939 (La.1982); *State v. Fernald,* 397 A.2d 194 (Me.1979); *Commonwealth v. Jones,* 362 Mass. 497, 287 N.E.2d 599 (1972); *State v. Ammons,* 208 Neb. 812, 305 N.W.2d 812 (1981); *Porter v. State,* 94 Nev. 142, 576 P.2d 275 (1978); *People v. Valentine,* 53 A.D.2d 832, 385 N.Y.S.2d 545 (1976); *State v. Schroeder,* 62 Or.App. 331, 661 P.2d 111, *petition denied,* 295 Or. 161, 668 P.2d 380 (1983); *State v. Porraro,* 121 R.I. 882, 404 A.2d 465 (1979); *State v. Wooden,* 658 S.W.2d 553 (Tenn.Crim. 1983); *State v. Onorato,* 142 Vt. 99, 453 A.2d 393 (1982); *State v. Guloy,* 104 Wash.2d 412, 705 P.2d 1182 (1985), *cert. denied,* ⸺ U.S. ⸺, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986).

In *Amaral,* 488 F.2d 1148, the court said:

"Our legal system places primary reliance for the ascertainment of truth on the 'test of cross-examination.' *United States v. De Sisto*[, 329 F.2d 929], 934 [ (2d Cir.1964) ]. In *De Sisto,* a truck driver, victim of a hijacking, testified as to the identity of the hijacker and gave conflicting testimony regarding the presence or absence of tattoo marks on the accused's arms. Judge Friendly wrote that the jury was 'superbly equipped' to evaluate the impact of the stress during the hijacking on the perception of the identification witness. *De Sisto, supra,* at 934. It is the responsibility of counsel during cross-examination to inquire into the witness' opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention.

"Indeed, the research of Dr. Robert Buckout [sic], whose expertise in the area of perception was acknowledged by the Government (although he was not to testify at the trial) indicates that the effects of stress on perception can be effectively communicated to the jury by probing questioning of the witnesses. In his study, Dr. Buckout [sic] reports that eye-witnesses do reply 'I can't recall, it happened so fast' [Record at 140]. Certainly effective cross-examination is adequate to reveal any

inconsistencies or deficiencies in the eye-witness testimony. Here defense counsel uncovered no confusion or uncertainty as to identity in any of the various witnesses. Furthermore, not all witnesses were under similar conditions of stress: one saw the accused as he sat in his car blocking the accused's exit from the bank parking lot, another saw the accused from the safety of her house as he returned to his truck after having robbed the bank, yet another saw him as he entered the bank and approached the teller to whom he delivered the threatening note." 488 F.2d at 1153.

In *Porraro*, 121 R.I. 882, 404 A.2d 465, the trial court excluded testimony of a psychology professor "proffered as an expert witness on the factors that affect the reliability of eyewitness identifications" on the grounds that "it would effectively invade the province of the jury" and "that admitting this testimony would open a floodgate whereby experts would testify on every conceivable aspect of a witness' credibility." The Supreme Court of Rhode Island said:

"We are persuaded that the subject matter of the proffered testimony in this case, the trustworthiness in general of eyewitness observations, was not beyond the ken of the jurors and therefore the trial justice did not abuse his discretion in excluding this evidence. Through cross-examination, defense counsel was able to probe into the witness' capacity and opportunity for observation, her attention, interest and distraction. The jury was perfectly capable of assessing the witness' credibility by weighing the inconsistencies and deficiencies elicited in cross-examination. We also note that this precise issue has arisen on innumerable occasions in other jurisdictions. The reported decisions have uniformly sustained a trial justice's discretionary decision to exclude exactly the same type of expert testimony that defendant has sought to place before the jury in this case. *See, e.g., United States v. Brown,* 540 F.2d 1048, 1054 (10th Cir.1976); *United States v. Amaral,* 488 F.2d 1148, 1152–53 (9th Cir.1973); *United States v. Fosher,* 449 F.Supp. 76, 77

(D.Mass.1978); *Dyas v. United States,* 376 A.2d 827, 831–32 (D.C.App.1977); *Nelson v. State,* 362 So.2d 1017, 1021 (Fla.Dist.Ct.App.1978); *Jones v. State,* 232 Ga. 762, 766, 208 S.E.2d 850, 853–54 (1974); *Commonwealth v. Middleton,* 6 Mass.App.Ct. 902, 902, 378 N.E.2d 450, 450 (1978)." 121 R.I. at 892–93, 404 A.2d at 471.

■ In *McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, the California court rejected the *Frye* test as to such evidence, stating:

"[C]ourts have invoked the *Kelly-Frye* rule primarily in cases involving novel devices or processes such as lie detectors, 'truth serum,' Nalline testing, experimental systems of blood typing, 'voiceprints,' identification by human bite marks, microscopic analysis of gunshot residue, and hypnosis (*People v. Shirley* (1982) 31 Cal.3d 18, 51–54 [181 Cal.Rptr. 243, 641 P.2d 775], and cases cited), and, most recently, proof of guilt by 'rape trauma syndrome' (*People v. Bledsoe* (1984) 36 Cal.3d 236, 246–251 [203 Cal.Rptr. 450, 681 P.2d 291])." 37 Cal.3d at 373, 208 Cal.Rptr. at 251, 690 P.2d at 724.

The catalog Judge Eldridge made for the Court in *Reed* of techniques in which the *Frye* test has been applied is similar to the California catalog. 283 Md. at 383, 391 A.2d at 369. Our own use of what we denominate as the *Frye-Reed* test has been confined to "voice-prints" in *Reed* and to hypnosis, *State v. Collins,* 296 Md. 670, 681, 464 A.2d 1028, 1034 (1983). We agree that the *Frye-Reed* test is not properly applicable to this evidence. Hence, to that extent the trial judge erred. This appears to have been an alternate ground for his holding, however.

■ The Maryland test for admissibility of expert testimony was set forth for the Court by Judge Hammond in *Shivers v. Carnaggio,* 223 Md. 585, 165 A.2d 898 (1960):

"Wigmore and McCormick agree that the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented. 7 *Wigmore, Evi-*

*dence* (3rd Ed., 1940), Sec. 1923: 'But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help?' *McCormick, Evidence,* Sec. 11: 'It is believed that the standard actually applied by the trial judges of today approaches more nearly the principle espoused by Wigmore [Vol. 7, 3rd Ed., Sec. 1918], namely that the opinion should be rejected only when it is superfluous in the sense that it will be of no value to the jury.'

"Both Wigmore and McCormick think little of the argument that opinions on the very issue before the jury should be rejected because they invade the province of the jury. 7 *Wigmore, op. cit.* Sec. 1921, deals with this idea as follows: 'When all is said, it remains simply one of those impracticable and misconceived utterances which lack any justification in principle.' *McCormick, op. cit.* Sec. 12, page 26, says: 'It is believed, however, that this general rule is unduly restrictive, is pregnant with close questions of application, and often unfairly obstructs the party's presentation of his case.' " 223 Md. 588–89, 165 A.2d at 900. (Emphasis in original.)

See also *Reed,* 283 Md. at 380, 391 A.2d at 367; *Stickell v. City of Baltimore,* 252 Md. 464, 474, 250 A.2d 541, 547 (1969); *Starr v. Oriole Cafeterias,* 182 Md. 214, 218, 34 A.2d 335, 337 (1943).

The test for appellate review of the exclusion of proffered expert testimony was stated for the Court by Judge Levine in *Raithel v. State,* 280 Md. 291, 372 A.2d 1069 (1977):

"[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal. *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977); *see I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 12–13, 344 A.2d 65 (1975); *Franceschina v. Hope,* 267 Md. 632, 636, 298 A.2d 400 (1973). It is well settled, however, that the trial court's determination is reviewable on appeal, *Radman v. Harold,* 279 Md. at 173, 367 A.2d 472; *Refrigerating Co. v.*

*Kreiner*, 109 Md. 361, 370, 71 A. 1066 (1909), and may be reversed if founded on an error of law or some serious mistake, or if the trial court has clearly abused its discretion. *Radman v. Harold*, 279 Md. at 173, 367 A.2d 472; see *Telak v. Maszczenski*, 248 Md. 476, 496–97, 237 A.2d 434 (1968)." 280 Md. at 301, 372 A.2d at 1074–75.

See also *Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

Given the discretion lodged in trial judges as to the admission of expert evidence, we find no error on the part of the trial judge in declining to admit this type of expert testimony.

## C. THE TERRIBLE THING

■ The State called Rose Carson to testify as to a conversation she had with Bloodsworth in Cambridge. On direct examination she was asked whether she recalled what she and Bloodsworth had talked about during the weekend. The record is:

"He said that, he asked me that I give him a place to stay for the night. That he had done something bad. That he needed a place to stay until the next day, which would have been Monday, and he was going to the State hospital to see if he could get admitted.

"Q Okay. What if anything did he say with regard to his wife?

"A He just said he had done something bad and that he was afraid that him and his wife wouldn't get back together because of it."

The Carson testimony no doubt prompted the questions propounded to Birdie Plutschak, Bloodsworth's mother-in-law, as a part of the defense case. She testified to a telephone conversation which she had with Bloodsworth. The record is:

"Q And what else was the conversation? What other conversation took place?

"A And then he was very upset. He told me that he had done a terrible thing. I said what was that? He said, because I got—

"MR. LAZZARO: I object to any self-serving statements of the Defendant Your Honor.

"THE COURT: Sustained."

Bloodsworth objects to the trial court's having sustained on the ground that it was self-serving any response by Mrs. Plutschak as to what the "terrible thing" was that he had done. As our discussion under Part I of this opinion indicates, this "terrible thing" was a part of the State's case where the conviction was obtained upon the basis of circumstantial evidence. If the evidence here was essentially contemporary in point of time, we believe the witness should have been permitted to answer.

### D. EXCLUSION OF IDENTIFICATION EVIDENCE PROFFERED BY BLOODSWORTH

The State called Detective Robert Capel as a witness. On direct examination he testified as to the composite sketch and photographic identification made by Christian Shipley. He also testified as to line-up identifications of Bloodsworth by five witnesses. On cross-examination the defense sought to question Capel regarding a line-up conducted at the same time as the other line-ups in which someone other than Bloodsworth was identified. He was asked whether he talked to Debra McNamara in the case. He replied in the affirmative. An objection was sustained to a question as to whether she attended the line-up. He was asked whether she gave a description. A bench conference followed the objection of the State at which time the defense said:

"I don't want to call her as a witness. I can't vouch for her. I think she's way off, she is the one that, to refresh your recollection, is the one that said that Kirk Bloodsworth was nude in the woods."

Defense counsel indicated that his "purpose [was] to bring out the fact that there were statements made by witnesses who identified Mr. Bloodsworth that the police obviously did not believe, even though they went to a line-up and they identified him." He said he thought "the jury has a right to know that people who they brought in were not able to identify Kirk Bloodsworth. That's exculpatory evidence, and I think Miss McNamara's testimony is exculpatory." The trial judge said:

"It's available for you, if you want to call the witnesses, but it is hearsay otherwise."

The defense also sought to question Capel regarding a second composite sketch. At the bench as a reason for the State's objection it was stated that defense counsel was "about to get into the making of a composite with a witness who has not testified and is not going to be called by the State and is certainly available to the Defendant." The defense agreed that Fay McCullough was the witness in question. The trial court found such evidence to be hearsay and excluded it.

The defense called Detective Hessie as a witness. He was asked to tell the jury what description he had of the suspect. The trial judge said:

"I'm not going to let you ask him what the description is, when it is clear from this report, that description up here is very probably not a description given down here or given by Chris or Jackie Poling.

"This up here is a description that was put together by others from various sources, and I think it would be highly improper to let that come in in this fashion. If you want to ask him what the source of his information is and then go to the source, it's up to you, but I'm not going to let you ask him what the description is in this fashion."

The defense called Officer Pacquin as a witness. He testified as to investigation in the neighborhood two days after the murder. He said:

"We knocked on the door, and we asked them if they had seen anything in the area and if they had seen anything on the date of that offense, if they have seen any suspicious people or anything, vehicles in the area." He was then asked whether he gave the people a description of the suspect for whom they were looking. He replied that he "told them basically what [the police] were looking for and asked them if they had seen it." The next question was as to what description he gave these people. In response to the objection the trial judge said:

"The danger of that, Mr. Scheinin, as you well know is to confuse the jury. It has no probative value in this case based on the evidence that has been submitted."

Bloodsworth sees himself as having been denied due process rights, citing *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Austin v. State,* 253 Md. 313, 252 A.2d 797 (1969), and *DeLilly v. State,* 11 Md.App. 676, 276 A.2d 417 (1971). We deem those cases inapposite. He also says the exclusion violated Maryland rules of evidence, citing *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965), and *Judy v. State,* 218 Md. 168, 146 A.2d 29 (1958). We had occasion to refer to *Johnson* in *Bedford v. State,* 293 Md. 172, 176–77, 443 A.2d 78, 80 (1982), where we discussed circumstances pertaining to an extrajudicial identification. The circumstances here do not fit our prior Maryland cases.

The trial judge was correct in his ruling.

### E. PAST RECOLLECTION RECORDED

The State called as a witness Tina Christopher who had had conversations with Bloodsworth in Cambridge shortly after his initial contact with Baltimore County police in Cambridge. After some questioning of her the State asked to have a statement Miss Christopher had given to the police marked for identification. She was then asked if she remembered talking to the police about the conversation she had with Bloodsworth. She replied in the affirmative. In response to a question she said that it was maybe a month

or a couple of months after the conversation that she talked with the police. The record then is:

"Q How well did you remember the conversation you had had with Mr. Bloodsworth when you were talking to the police?

"A Very well.

"Q How well do you remember it today?

"A Not too good."

She was then shown the typewritten statement and identified her signature on each page thereof. She said she reviewed the statement before she signed it and the statements appearing in it were true. The State then sought to introduce the statement into evidence. Bloodsworth's objection was sustained and the witness was permitted to review the statement to refresh her recollection. She was questioned further. Defense counsel asked that she not read from the statement. After further questioning the record is:

"Q Now, do you remember anything more without looking at your statement?

"A No."

The statement was then admitted into evidence as past recollection recorded.

Bloodsworth contends that there was error in admitting the statement because "[t]here was no showing that Christopher's present recollection was impaired," referring to *Mouzone v. State*, 294 Md. 692, 701, 452 A.2d 661, 666 (1982). There the Court said, "At a minimum, in order to qualify as past recollection recorded, the party who seeks to move the statement into evidence must show some impairment of present recollection." Further objection is made on the basis that Miss Christopher said the statement was made a month or two after she talked to Bloodsworth. Bloodsworth notes that the statement is dated August 10, 1984, two days after the conversation occurred. It is asserted, "Even if the date on the statement takes precedence over Christopher's testimony, two days is too long to satisfy the contemporaneous requirement."

E. Cleary, *McCormick's Handbook of the Law of Evidence*, § 299 (3d ed. 1984) states:

"As the rule permitting the introduction of past recollection recorded developed, it required that four elements be met: (1) the witness must have had firsthand knowledge of the event, (2) the written statement must be an original memorandum made at or near the time of the event and while the witness had a clear and accurate memory of it, (3) the witness must lack a present recollection of the event, and (4) the witness must vouch for the accuracy of the written memorandum." *Id.* at 864.

At § 301 McCormick states, "[T]he tendency seems to be towards acceptance of the formulation favored by Wigmore which would require only that the writing be made or recognized at a time when the events were fairly fresh in the mind of the witness." This is the formulation adopted in Fed R. Evid. 803.

In *United States v. Williams*, 571 F.2d 344 (6th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978), the court approved admission of a statement given by a witness to a Secret Service agent approximately six months after the events recited in the statement. In *United States v. Senak*, 527 F.2d 129, 136–42 (7th Cir.1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758 (1976), the court approved admission of a statement given by a witness for the prosecution to the Federal Bureau of Investigation three years after the events described therein. The court said:

"[T]he fact that there is no rule, other than the credibility scrutiny of the trier of fact, which curtails the lapse of time applicable to the live witness on the stand, would suggest that we should not arbitrarily say any given length of time is too long for the statement-giver to have an accurate memory and for a proper application of the past recollection recorded procedure." 527 F.2d at 141.

 The impairment of the witness' memory was demonstrated by the record. Any lapse of time between the date of the occurrence and the date of the statement, which

we presume here to have been two days, would go to the weight of the evidence, not to its admissibility. There was no error in admitting the statement.

## F. THE VICTIM IMPACT STATEMENT

Bloodsworth takes issue with the admission of the victim impact statement. He contends that Code (1957, 1982 Repl. Vol., 1985 Cum. Supp.) Art. 41, § 124 (which calls for the admission of victim impact statements in capital proceedings) is unconstitutional, although he recognizes, as he must, that in *Lodowski v. State,* 302 Md. 691, 735–49, 490 A.2d 1228, 1251–58 (1985), *vacated and remanded on other grounds,* —— U.S. ——, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986), we held to the contrary. We have reaffirmed that holding in *Booth v. State,* 306 Md. 172, 222–23, 507 A.2d 1098, 1123–24 (1986), and in *Grandison v. State,* 305 Md. 685, 752–54, 506 A.2d 580, 614 (1986). We deem the matter closed.

JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL; BALTIMORE COUNTY TO PAY THE COSTS.

COLE, J., concurs in the result.