956 A.2d 215

**Tavon BOMAS a/k/a Tavon Bomar**

v.

**STATE of Maryland.**

**No. 1720, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 5, 2008.

Marc A. DeSimone, Jr. (Nancy S. Forster, Public Defender, on brief), for appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel: KRAUSER, C.J., JAMES R. EYLER, WRIGHT, JJ.

KRAUSER, C.J.

Convicted by a jury in the Circuit Court for Baltimore City of second-degree murder and the use of a handgun in a crime of violence, appellant, Tavon Bomas a/k/a Tavon Bomar, contends that the circuit court abused its discretion in excluding the testimony of an expert witness called by the defense to opine as to the reliability of human memory, in general, and eyewitness testimony, in particular. Because we conclude that the circuit court did not abuse its discretion in so ruling, we affirm.

## Background

At approximately 2:00 a.m. on April 18, 2004, Detective Kenneth Bailey was stopped in traffic outside of "the Tower Lounge," a bar on York Road in Baltimore City. Hearing gunshots, the off-duty detective saw one young African American man, approximately two to three car lengths away, shoot another African American male. The shooter then fled on foot, crossing York Road in front of the detective, who was then a car length away.

Getting out of his truck, Detective Bailey drew his weapon and began to pursue the shooter. But his pursuit was interrupted when the detective, dressed in plain clothes, was stopped by another police officer. After Detective Bailey identified himself, they both gave chase, but appellant had disappeared. A week later, in a written report of the episode, Detective Bailey described the shooter simply as a "black male."

On October 14, 2004, nearly six months after the shooting, the police arrested Jimmy Dower for possession of heroin. At that time, Dower identified appellant as the shooter. He told the police officers that he was in the Tower Lounge on the night of the shooting, and there, he saw appellant, whom he had known "practically all his life" and whose nickname, he told police, was "Henny Low." Inside the bar, appellant was fighting with another African American male. Dower watched as appellant then left the bar and entered a residence on the same street. A few minutes later, appellant returned with a gun and shot the victim.

After Dower identified appellant as the shooter, Detectives Richard Purtell and Ray Lasslet assembled a photographic array, which included appellant's photograph. From that array, Detective Bailey identified appellant as the shooter.

Later, the detectives met with Dower. The meeting took place at a convenience store parking lot, rather than his house, because Dower was afraid to be seen speaking to the police. There, Dower identified appellant from a photographic array and wrote on the back of appellant's picture: "This is H. Low.

He did the murder on York Road." Dower then signed his name.

Appellant was arrested a week later, on November 3, 2004. He initially told the officers that he was not in the vicinity of the shooting on the night that it occurred, but later admitted he was there that night and saw the shooting.

On July 7, 2006, a pretrial hearing was held on appellant's motion to introduce the testimony of Dr. David Schretlen, Ph.D. At that hearing, the doctor, an expert in the field of neuropsychology, testified regarding memory processing; the circumstances that affect "memory, encoding, retrieval and storage"; the effect that the passage of time has on memory; and the effect of stress and violent events on memory formation. The court concluded that Dr. Schretlen's proffered testimony "would be of no value to the jury" and denied appellant's motion.

At trial, two eyewitness identifications of appellant as the shooter were introduced into evidence, Dower's and Detective Bailey's. Even though Dower testified that his prior photographic array identification was not reliable because he had poor eyesight and the actual shooter had "deep dimples" (which appellant does not), his prior identification was admitted into evidence. But this identification is not relevant to the issue before us, as appellant concedes that "Dr. Schretlen's opinions relate[d] only to eyewitnesses such as Detective Baily who had no prior contact with the suspect," and not to eyewitnesses, like Dower, who claimed to have known appellant "practically all his life."

Detective Bailey testified concerning his prior photographic array identification of appellant and then made an in-court identification of appellant as the shooter. After the jury convicted appellant of second-degree murder and related handgun offenses, the court sentenced appellant to a term of thirty years' imprisonment for second-degree murder and to a term of twenty years' imprisonment for the use of a handgun in the commission of a crime of violence. The sentences were to run consecutively.

### Discussion

Appellant contends that the circuit court "erred in failing to permit" him to "offer[ ] the opinions of a qualified expert, Dr. Schretlen, which would alert the jury to the known deficiencies of eyewitness identifications." The court, he appears to claim, had little, if any, discretion to exclude such evidence. And, even if it did, the court abused that discretion, he maintains, by prohibiting Dr. Schretlen from testifying.

### I.

The admissibility of expert testimony is governed by Maryland Rule 5–702, which states, in part: "Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." [1] In other words, "[e]xpert testimony is admissible only if it is relevant. . . ." *Bryant v. State,* 163 Md.App. 451, 473, 881 A.2d 669 (2005) (citing *State v. Smullen,* 380 Md. 233, 268, 844 A.2d 429 (2004)). And such evidence is relevant if " 'the jury will find the testimony helpful in resolving the issues in the case.' " *Id.* (quoting *Wise v. State,* 132 Md.App. 127, 135–36, 751 A.2d 24 (2000)).

The determination of whether an expert's testimony is admissible, pursuant to Rule 5–702, lies "within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous." *Wilson v. State,* 370 Md. 191, 200, 803 A.2d 1034 (2002). And that decision, we have stated, will "seldom constitute[ ] ground for reversal." *Bryant,* 163 Md.App. at 472, 881 A.2d 669.

In *Bloodsworth v. State,* 307 Md. 164, 512 A.2d 1056 (1986), the Court of Appeals considered whether the admission of expert testimony concerning the reliability of human memory

---

1. Rule 5–702 further states: "In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

and eyewitness identifications lies within the discretion of the trial court. *Id.* at 184–86, 512 A.2d 1056. The Court of Appeals concluded that it did. *Id.* at 185–86, 512 A.2d 1056.

Bloodsworth was charged with first-degree murder, rape, and sexual offense. *Id.* at 166, 512 A.2d 1056. At trial, a number of witnesses placed him at the scene of the crime interacting with the victim shortly before the victim's murder. *Id.* at 167–69, 512 A.2d 1056.

To counter that testimony, Bloodsworth sought to introduce an expert who would testify "that eyewitnesses are ... confronted with ... a very difficult challenge to the memory system" and would provide the jury with a methodological "checklist ... so that they [could] essentially assess" the eyewitnesses' testimony through "the filter of the scientist." *Id.* at 177–78, 512 A.2d 1056. But the trial court excluded that testimony. *Id.* at 178–79, 512 A.2d 1056.

It held, first, that the testimony "utterly fail[ed]" the *Frye–Reed* test for novel scientific or experimental evidence because the proffered expert's testimony was not "general[ly] accept[ed] in the relevant scientific community," *id.* at 179, 512 A.2d 1056, and, second, that the evidence would not be helpful to the jury. *Id.* As to its second basis for excluding the expert's testimony, the trial court opined: "[T]he proffer is not sufficient to persuade me ... exactly what is even being offered to the jury other than some generalized explanation of the studies that have been made." *Id.* The reliability of eyewitness testimony, the trial court declared, is better tested by cross-examination than by the opinion of an expert. *Id.*

But it was because of a *Brady* violation [2] that the Court of Appeals ultimately overturned Bloodsworth's convictions.[3] In so doing, it addressed, for the guidance of the circuit court on

---

**2.** *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**3.** It found that the State's withholding from the defense a police report, which mentioned a potential additional suspect, was a *Brady* violation. *Bloodsworth,* 307 Md. at 175–76, 512 A.2d 1056.

remand, the admissibility of expert testimony concerning the reliability of eyewitness testimony. The Court declared that the general "Maryland test for admissibility of expert testimony" applied. *Id.* at 184–85, 512 A.2d 1056. It stated: " '[T]he test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented.' " *Id.* at 184, 512 A.2d 1056 (quoting *Shivers v. Carnaggio,* 223 Md. 585, 165 A.2d 898 (1960) (internal citations omitted)). The application of this test, it opined, is left to the sound discretion of the trial court. *Id.* at 185–86, 512 A.2d 1056.

Asking us to reject *Bloodsworth*'s embrace of this standard, appellant claims that "[t]he parameters of judicial discretion regarding the admissibility of an expert witness on eyewitness memory and identification have changed dramatically in the two decades since the Court of Appeals decided *Bloodsworth* . . . ." Appellant advances two arguments in support of this claim. First, he contends that a later case, *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), "calls into question *Bloodsworth*'s continuing legal validity" because, in *Simmons,* the Court of Appeals recognized that a criminal defendant might be able to "offer [an] expert opinion[ ], notwithstanding the fact that [it] . . . may [go to an] ultimate determination[ ] of witness credibility."

But that issue was not addressed by the Court of Appeals in *Bloodsworth.* Moreover, it is well settled, first, by caselaw, *see, e.g., Balto. & Yorktown Turnpike Road Co. v. Leonhardt,* 66 Md. 70, 77–78, 5 A. 346 (1886), and now, by rule, that expert testimony is admissible even if it involves an ultimate issue. Rule 5–704 states that expert testimony that is "otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact."

Second, appellant claims that the Court of Appeals' position in *Bloodsworth* should, in any event, be revisited "given the recent technological advances which have exposed the stark prevalence and consequence of erroneous eyewitness testimony" and "a national shift in the law . . . [to] favor[ ] admitting

expert testimony concerning the inadequacies of eyewitness identifications." In response to this argument we need say no more than that *Bloodsworth* is a decision of our highest court, and, if it is to be revisited, it is the prerogative of that Court, not ours, to do so.

■ In sum, expert testimony concerning the reliability of eyewitness testimony is admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue," Rule 5–702, and the trial court's determination of whether to admit such evidence will not be disturbed on appeal unless it " 'has clearly abused its discretion.' " *Bloodsworth,* 307 Md. at 186, 512 A.2d 1056 (quoting *Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069 (1977)).

## II.

■ We now consider appellant's contention that the circuit court "abused its discretion in failing to permit ... the opinions of a qualified expert, Dr. Schretlen, which would alert the jury to the known deficiencies of eyewitness identifications."

At the hearing on appellant's motion to introduce Dr. Schretlen's testimony, Schretlen testified about the effect that the passage of time has on the formation of memory. The doctor asserted that the relationship between the passage of time and memory was not a linear one. He explained that, when a person forms a memory, "the most important increments in exposure time are those milliseconds to seconds rather than from minutes to hours" and that "[i]t only takes a few seconds for someone to encode ... pretty well."

A similar non-linear relationship exists, the doctor stated, between the time after exposure to a given phenomenon and the amount of information an individual forgets. He opined that people do not forget on "a straight line," rather, "we forget ... most information in the first few seconds or minutes ... and less and less ... as time goes by." According to Dr. Schretlen, while most people intuitively grasp that they

forget more as time goes by, "what's not intuitive is that it's not a linear relationship."

Dr. Schretlen also testified as to whether stress and violent events affect memory. He stated that "very little data" exists as to the effects of violent events or extreme stress on memory because the institutional review boards are reluctant to approve of such experiments. But, based on the limited data he had,[4] the doctor opined that "high levels of stress might actually impair memory" but that "[s]tudies ... of lower level stress suggest that ... a moderate level [of stress] can actually be beneficial ... [and] can help you encode information." He was, however, unaware of any study that had considered the effect of a stressful or violent event on a bystander rather than the victim of such an event.

Dr. Schretlen, also, briefly addressed whether trained police officers perform better in eyewitness memory tests than others. He stated: "[B]y and large ... studies comparing ... police officers and ... lay persons in their ability to remember faces or staged events ... [do not] appear [to show] that police officers have any particular advantage...." But he acknowledged that some studies had shown police fared better than lay persons in remembering "peripheral details."

At the close of the pretrial hearing, the circuit court determined that Dr. Schretlen's testimony would not be helpful to the jury in assessing the reliability of Detective Bailey's identification of appellant and excluded the doctor's testimony. In so ruling, the court noted that "testing the trustworthiness of ... eyewitness identifications is a matter that is not beyond the ability of lay jurors without the aid of expert testimony" and that appellant, "through cross-examination, will have an opportunity to probe the officer's ability to observe, remember, and recall the event in question...." The court stated

---

4. The only specific evidence referred to by the doctor was a study of U.S. soldiers undergoing survival skills training that showed that soldiers performed much better at "remember[ing] the faces of interrogators who interrogate[d] them in a low stress fashion compared to interrogators who interrogate[d] them in a high stress fashion."

that "[t]he jury will be perfectly able to assess the officer's testimony through direct and cross-examination."

The court also explained why, under the circumstances of this case, it concluded that Dr. Schretlen's testimony would not be helpful to the jury. It stated:

[W]ith respect to the observing ability of a police officer, we have little or no information in terms of data or expert opinion from the doctor to even apply to Detective Bailey. With no information about the effects on human memory to witnesses of violent events; no specific information on the ability of trained police officers to encode, store, and retrieve information under stress or violent events to which they are the witness or the actual subject of themselves; and with [appellant's] acknowledgment that the effect[ ] of stress—in terms of it being an impediment or benefit to memory—depends on the level of [an] individual['s] stress; this court finds that Dr. Schretlen's testimony would be of no value to the jury. . . .

Appellant challenges the court's reasoning that "the trustworthiness of general eyewitness identification is a matter that is not beyond the ability of lay jurors without the aid of expert testimony" and that "[t]he jury will be perfectly able to assess the officer's testimony through direct and cross-examination." According to appellant, the court abused its discretion in assuming that potential deficiencies in the detective's recollective capacities could be exposed through cross-examination. There is, he claims, a "recent national trend in the law" that recognizes that "reliance on . . . jurors' common sense and understanding is an insufficient proxy for expert guidance as to the limits of eyewitnesses." Appellant's argument relies exclusively on decisions from other jurisdictions suggesting that studies have shown that juries give much weight to the memories of eyewitnesses, even when the memories have been shown to be unreliable.[5] But the studies were not part of Dr.

---

**5.** Appellant relies on *United States v. Brownlee,* 454 F.3d 131 (3rd Cir.2006), where the United States Court of Appeals for the Third Circuit reviewed a large amount of scholarly materials concerning the

Schretlen's testimony. He neither relied upon them nor even referred to them in the course of testifying.

Moreover, the circuit court did not suggest, as appellant maintains, that, in all instances, cross-examination can be relied upon to expose the inherent weakness of eyewitness testimony or that expert testimony is per se inadmissible on the question of eyewitness reliability. Rather, the court's basis for excluding Dr. Schretlen's testimony hinged upon its conclusion that, under the circumstances of this case, the doctor's opinions were not going to be helpful to the jury in assessing Detective Bailey's identification of appellant. The court's decision to limit the admission of testimony to that which was relevant to the case is precisely the analysis called for by Rule 5–702. The fact that, in the course of making this determination, the court stated that "[t]he jury will be perfectly able to assess the officer's testimony through direct and cross-examination" was not an abuse of discretion. *See Bloodsworth*, 307 Md. at 178–79, 186, 512 A.2d 1056.

Appellant also contends that the court abused its discretion in excluding Dr. Schretlen's testimony as "not helpful." He claims that Dr. Schretlen's testimony would have been helpful in three ways.

First, appellant argues that Dr. Schretlen's testimony regarding the "forgetting curve" was relevant because "the relationship between delayed identifications and their strength is beyond the knowledge of a layperson." And, thus, this

---

uncertainty of human memory and the reliability of eyewitness identifications. The *Brownlee* Court noted that "while science has firmly established the 'inherent unreliability of human perception and memory,'" *id.* at 142 (quoting Rudolf Koch, Note, *Process v. Outcome: The Proper Role of Corroborative Evidence in Due Process Analysis of Eyewitness Identification Testimony*, 88 Cornell L.Rev. 1097, 1099 n. 7 (2003)), "this reality is outside 'the jury's common knowledge,' and often contradicts jurors' 'commonsense' understandings." *Id.* (quoting Koch, 88 Cornell L.Rev. at 1105 n. 48). He also relies on *United States v. Smithers*, 212 F.3d 306 (6th Cir.2000) ("Today, there is no question that many aspects of perception and memory are not within the common experience of most jurors, and in fact, many factors that affect memory are counter-intuitive.").

testimony would have allowed the jury to better assess how much Detective Bailey had forgotten between witnessing the shooting and identifying the shooter.

But the only aspect of memory that the doctor, himself, characterized as "counter-intuitive," and thus beyond the knowledge of a layperson, was the "forgetting curve," which posits that "we forget the most information in the few seconds or minutes after we're exposed to it and we forget less and less . . . as time goes by." Yet, he conceded, on cross-examination, that the fact that memories dim over time was a matter that could be understood without expert testimony:

Q: Now [Dr. Schretlen], it was your testimony this morning that there are things of which you would testify that are common sense to a potential[ ] juror . . . correct?

A: Yes.

Q: And you said that of those issues that are common sense, the longer the amount of time between the time that someone witnesses something to the time they actually talk about it or make an identification or whatever, there is going to be less retrieval. The more time that goes on, the less amount of retrieval that could potentially occur, correct?

A: Correct.

Q: And that's common sense for the jury, correct?

A: I would think so.

Based on this testimony, the court concluded that the extent to which Detective Bailey's memory may have diminished during the six-month interval between the murder and his identification of appellant was not beyond the ken of the jury to assess. The court stated that "Dr. Schretlen candidly testified that some matters relating to evaluating eyewitness identifications are simply matters related to common sense and this court agrees." Indeed, while the jury might not have intuitively grasped that the most rapid loss of memory occurs in the "first seconds or minutes" after perceiving an event and then tapers off in a "curvilinear" fashion over greater dura-

tions of time, that feature of recollection was not relevant to the question of how the passage of six months affected Detective Bailey's memory.

Second, appellant claims that Dr. Schretlen's testimony would have been helpful to the jury because it would have informed the jury of how "high levels of stress might actually impair memory rather than foster it." Addressing this point, the circuit court found that the testimony would not be helpful for several reasons. It noted Dr. Schretlen "has testified there is little data available on the effect of violent events on accuracy of . . . eyewitness identification." Further, the court pointed out that the studies upon which Dr. Schretlen relied pertained only to victims of a stressful event and not to eyewitnesses to such events, like Detective Bailey. Indeed, it observed: "In order for the doctor's testimony to have any relevance . . . we would . . . have . . . to extrapolate that Detective Bailey was a receiver of the stress." Moreover, Dr. Schretlen admitted, the court noted, that "low to moderate level of stress . . . could be beneficial" to memory.

Third, appellant argues that Dr. Schretlen's testimony would have been helpful in rebutting the "unfounded assumption" that police officers' eyewitness testimony was more reliable than that of others. Yet, Dr. Schretlen's testimony was actually rather equivocal on this point:

Q: And have there been any scientific studies . . . on human memory of trained observers such as police officers?

A: Yes.

Q: And what have those studies concluded?

A: By and large there have been at least early on a number of studies comparing Public Safety Officials, police officers and other sorts of lay persons in their ability to remember faces or staged events and it doesn't appear that police officers have any particular advantage over . . . lay persons.

Q: So, in your expert opinion, the research ... has not shown that trained observers such as the police officer is more accurate than a non-trained person?

A: In general, that's the case. There are certainly some studies showing that police officers tend to be a little bit better at recording peripheral details but they're not typically better at remembering faces.

Based on this vague testimony, the circuit court understandably concluded that, "with respect to the observing ability of a police officer, we have little or no information in terms of data or expert opinion to even apply to Detective Bailey."

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**