543 A.2d 382

**Kirk Noble BLOODSWORTH**

v.

**STATE of Maryland.**

**No. 1376, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

July 8, 1988.

Certiorari Denied Oct. 11, 1988.

**26**

George E. Burns, Jr. and Julia Doyle Bernhardt, Asst. Public Defenders (Alan H. Murrell, Public Defender and Laurie I. Mikva, Asst. Public Defender, on the brief), Baltimore, Md., for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Sandra A. O'Connor, State's Atty. for Baltimore County, S. Ann Brobst and Michael Pulver, Asst. State's Attorneys for Baltimore County, on the brief, Towson), for appellee.

Argued before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

BISHOP, Judge.

A jury in the Circuit Court for Baltimore County (Smith, J.) convicted Kirk Noble Bloodsworth, appellant, of first degree murder, felony murder and first degree sexual offense under MD.ANN.CODE Art. 27, §§ 407, 410 and 462, respectively.[1] For the first degree murder conviction and for the first degree rape conviction, the trial court sentenced Bloodsworth to consecutive life terms. Bloodsworth asks whether:

I. There was sufficient evidence.

---

[1] The Court of Appeals reversed Bloodsworth's initial convictions for first degree murder, first degree rape and first degree sexual offense and awarded him a new trial in *Bloodsworth v. State*, 307 Md. 164, 512 A.2d 1056 (1986). The present appeal stems from the second trial.

II. The trial court erred in admitting as rebuttal evidence appellant's testimony from his first trial.

III. The State withheld exculpatory evidence.

IV. The trial court abused its discretion in denying appellant a new trial.

V. The trial court erred in admitting "other crimes" evidence.

VI. The trial court erred in admitting certain hearsay evidence.

VII. The trial court erred in excluding certain evidence of a composite sketch.

VIII. The trial court erred in refusing to call a witness as a court's witness.

IX. The trial court erred in admitting photographic evidence of the pattern of the sole of Richard Gray's shoe.

X. The trial court erred in admitting evidence that appellant became a suspect as a result of a "tip".

XI. The State made an improper closing argument.

I.

*Sufficiency*

Bloodsworth challenges the sufficiency of the evidence to convict, just as he did in *Bloodsworth v. State*, 307 Md. 164, 512 A.2d 1056 (1986) (*Bloodsworth I*). As the Court of Appeals stated in *Bloodsworth:*

[w]e first address that issue because if there were insufficient evidence to convict there could be no new trial.

The applicable standard is whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The standard is derived from *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Branch v. State*, 305 Md. 177, 182-83, 502 A.2d 496, 498 (1986); *State v. Rusk*, 289 Md. 230, 240, 424 A.2d 720, 725 (1981);

*Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). (Emphasis in original.)

*Id.* at 167, 512 A.2d 1056.

On July 25, 1984, police discovered the partially nude body of nine year old Dawn Hamilton in a wooded area near Golden Ring Mall in eastern Baltimore County. The victim was found lying on her stomach with an eight inch stick protruding from her vagina. Near the victim's head was found a large piece of concrete with a possible blood stain. The victim's skull was "fractured" and "depressed" and her scalp had "two tears" with a "very rough edge". The victim's neck had a "patterned abrasion". The opinion of the medical examiner, Dr. Dennis Smyth was that the death was a homicide and "was a result of blunt trauma to the head and strangulation."

On the morning of the murder, ten year old Christian Shipley and seven year old Jackie Poling were fishing at a pond near the scene. Christian testified that after a few hours, a man came by and Jackie showed him a turtle he had caught. Shortly thereafter, Dawn came by and asked the two boys to help her look for her cousin Lisa. The boys refused and resumed their fishing. The man, however, agreed to help Dawn and the two walked off together.

After Dawn's body was found, Christian assisted police in the production of a composite likeness of the man. Christian also picked Bloodsworth from a photographic array as the man he saw walk off with Dawn. Christian testified that at a police line-up, held on August 13, 1984, he recognized the man in the sixth position as the man who went into the woods with Dawn, but was afraid to tell the police. He made no identification at that time. Nonetheless, one of the investigating police officers, Detective Robert Capel, testified that immediately after the lineup, Christian told him that he "knew all the time that it was number six but he didn't want the man to hear his voice because the man could tell it was him because it was a little kid's voice." Christian also made an in-court identification of Bloodsworth.

Although he could not remember the exact day or year, Jackie Poling testified that he remembered going fishing with Christian Shipley on a day when he caught a turtle and that a man stopped to talk with him about the turtle. Jackie testified that Dawn came by and asked for help in finding her cousin and that, after he and Christian refused to help her, the man told Dawn he would help her look for her cousin and the two "walked off into the woods." He was unable to make an in-court identification of the man he saw at the pond.

When Jackie attended a line-up on August 13, 1984, he identified the man in the third position, not the appellant who was in the sixth position. After the line-up, Jackie, Christian and their mothers were taken to their homes in a police car. There is conflicting testimony regarding when Jackie informed his mother that the man he saw walk off with Dawn was "number six." Jackie's mother, Denise Poling, testified that he told her it was number six after the line-up but before they left the Towson police station. She acknowledged, however, that she did not inform any of the police officers at the station that Jackie had recanted his earlier identification and was now claiming that the man who walked off with Dawn had been number six. She testified further that although on the way home from the police station she discussed with Christian's mother the fact that Jackie had told her he had been scared and had identified the wrong man in the line-up, she did not mention that fact to the police officer who was driving the patrol car. Jackie, on the other hand, testified that he did not tell his mother about his misidentification until after they had been returned home from the line-up. It is undisputed, however, that Mrs. Poling did not tell the police what Jackie had told her until September 4, 1984, almost three weeks after the line-up. Upon receiving this information from Mrs. Poling, an officer went to the Poling home that evening and took a statement from Jackie which contained the above information.

Donna Ferguson testified that she saw the victim talking with a man near the woods at approximately 10:30 a.m. on

the day of the murder. At a police line-up, Ms. Ferguson identified Bloodsworth as the man she saw with the victim. Ms. Ferguson also made an in-court identification of Bloodsworth.

James Keller testified that he was driving down Fontana Lane, near the scene of the murder, at approximately 6:30 a.m. when he saw a man standing by the side of the road. From both a photo array and a police line-up, Keller identified Bloodsworth as the man he saw that day.

Soon after the murder, Bloodsworth's wife, Wanda, filed a missing person's report concerning Bloodsworth. Based on information obtained from that report, Detective Capel interviewed Bloodsworth in Cambridge on August 8, 1984, concerning his activities on the day of the murder. Detective Capel testified that Bloodsworth "had a hard time remembering his exact whereabouts," but that Bloodsworth said he had never been to the area near the murder scene. The detective testified that Bloodsworth told him that after picking up his paycheck, he left Baltimore on August 3, 1984, and took a bus to Cambridge. Prior to concluding the interview, Detective Capel took two photographs of Bloodsworth.

Detective Capel testified that he placed Bloodsworth's photograph in a photo array and showed the array to Jackie Poling and Christian Shipley. Christian Shipley identified Bloodsworth, but Jackie Poling was unable to make a positive identification. Based upon Christian's positive identification, Detective Capel obtained an arrest warrant for Bloodsworth, returned to Cambridge on August 9, 1984, arrested Bloodsworth and interviewed him a second time. The detective testified that he once again asked Bloodsworth about his activities on the day of the murder, July 25, 1984. He testified that Bloodsworth was unsure of his precise whereabouts, but that he was sure he had never been to the area where the victim was murdered. Detective Capel testified that he

asked the defendant why he was going around telling people in Cambridge about a bloody rock when only a few

policemen and the killer knew about a bloody rock and he said that he didn't know why. He denied it at first and then stated he just didn't know why he did it. And at that point he said that I didn't kill that child, only somebody sick would hurt a child.

Tina Christopher testified that she had a conversation [2] with Bloodsworth in Cambridge:

He was talking about this little girl. I thought it was his daughter, so I didn't really pay too much attention to him, but he described what this little girl was supposed to have been wearing and things that went on, and he said that him and that other guy was on this beach and this girl come up to him and asked him to help her, and this other guy was supposed to took her off somewheres [sic].

Q Did he say who this other guy was?

A No, I asked him that. I know he heard me because he looked up at me a couple of times but he never did answer who he was.

Q And how many times did he talk about this little girl?

A Once, and then he left and he come back and he started talking about her again, saying they think I did it.

[Defense Counsel]: Pardon? I can't hear you.

A He left once and then come back and said the police had questioned him and he said that they think I done it. And I don't know what he meant by that.

Q Now, when you were talking with the defendant, how was he acting?

A He, uhm, it is hard to explain. He acted like something was wrong with him. Really wrong.

Q Now, during your conversation with the defendant did he ever make any mention of a rock, do you recall?

---

**2.** The record does not contain the exact date of this conversation, it only indicates that it occurred in August of 1984. Since Bloodsworth was arrested on August 9, 1984, it must have taken place during the first eight days of that month.

A No, I don't.[3]

Tina Furbush testified that in August of 1984, she had a conversation with Bloodsworth in Cambridge in which Bloodsworth said, "he was a suspect in the rape and the murder of the little girl in Baltimore." Ms. Furbush testified that Bloodsworth also "talked about this guy that, you know, raped this little girl and the things that, something about some bloody rock and some underwear that was down at the police station that was supposed to scare him."[4] Ms. Furbush also testified that Bloodsworth told her the little girl was "in some wooded area by some water" and that "the little girl had asked to find, for him to help to find the friend, her friend, and I guess that's where he went and helped her find her friend." Ms. Furbush added further that Bloodsworth "didn't say he heard it from the police."

Rose Carson testified that in August of 1984, Bloodsworth came to Cambridge and asked if he could spend the night in her home. Bloodsworth said that on the next day "he would go admit himself to the State Hospital."[5] Ms. Carson testified that Bloodsworth told her, "I have done something really terrible. I am afraid that me and my wife won't get back together because of it...." Ms. Carson also testified that Bloodsworth said he was a suspect in the rape and murder of a little girl. This conversation took place on a Sunday (probably August 5, 1984, the Sunday before Bloodsworth's arrest).

Donna Hollywood testified that she owned a company called "Harbor to Harbor" in Baltimore County, near Essex.

---

**3.** Although the trial court allowed Tina Christopher to testify regarding her conversation with Bloodsworth, it refused to admit the statement she gave to the police which had been admitted in *Bloodsworth I,* 307 Md. at 169–170, 189–192, 415 A.2d 830.

**4.** Detective Capel testified that prior to his initial interview of Bloodsworth, he bought a pair of little girl's shorts and underpants and picked up an ordinary rock, without any bloodstains, and permitted Bloodsworth to view them "accidentally".

**5.** Eastern Shore State Hospital, a state mental hospital, is located near Cambridge.

In July, 1984, Bloodsworth worked at Harbor to Harbor for "about four weeks". Ms. Hollywood testified that on August 3, 1984, Bloodsworth

> was due to be at work at ten o'clock that day and he came in around maybe 10:30, quarter of eleven, into my office. And he said he was very ill and he looked very ill. He, I mean, very, he was very, very sick looking and he was sweating and white. And he said that he had the flu and that he wanted to know if I would give him his paycheck because he wanted to go, he had to meet his father downtown to go to a doctor because he was that sick. And so I went into the other office, and I gave him his paycheck and I told him that he looked so sick that he shouldn't go downtown.

In challenging the sufficiency of the evidence Bloodsworth argues that:

> [a]lthough it is clear that the victim was murdered, it is also clear that Appellant's convictions are founded upon nothing but exceedingly suspect identification evidence of him as a person seen with the child four hours before her body was discovered. This evidence cannot form the basis for a *rational* finding of guilt beyond a reasonable doubt. (Emphasis in original.)

It is settled, however, that "it is the province of the jury as fact finder, not the trial judge or an appellate court, to weigh the credibility of testimony and determine the issue of guilt or innocence." *Barnes v. State,* 57 Md.App. 50, 56, 468 A.2d 1040, *cert. denied,* 299 Md. 655, 474 A.2d 1344 (1984). We hold that the evidence reported above was sufficient for a rational fact finder to have found Bloodsworth guilty beyond a reasonable doubt of the crimes for which he was convicted.

## II.

### *Admission of Testimony From First Trial*

■ Bloodsworth argues that it was improper for the court to admit testimony from his first trial, because it was

not proper rebuttal evidence and because it was irrelevant.[6] In *Henze v. State*, 154 Md. 332, 347, 140 A. 218 (1928), the Court said:

> The admissibility of the evidence given at a former trial depends upon the question whether or not it was voluntary. To be admissible it must be voluntary, and where there is no evidence to the contrary, it will be presumed that the evidence so given was voluntary. The defendant at the former trial went upon the stand of his own volition, and the evidence there given is, we think, admissible in this case.

Bloodsworth does not argue, and the record does not indicate, that he testified at his first trial involuntarily. Accordingly, the State was free to use his former testimony in the later proceeding. *See also Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 247 (1968); *White v. State*, 23 Md.App. 151, 159, 326 A.2d 219 (1974), *cert. denied*, 273 Md. 723 (1975); *Edmonds v. United States*, 273 F.2d 108, 112–113 (D.C.Cir.1959); *Ayres v. United States*, 193 F.2d 739, 740 (5th Cir.1952).

Rose Carson had testified that Bloodsworth told her, "I have done something really terrible." On cross-examination, Ms. Carson testified that she had "assumed" that in that statement Bloodsworth referred to certain marital problems with his wife. Douglas Orr, a defense witness, testified that he and Bloodsworth had a conversation, in Baltimore, on a Friday in early August, 1984, (probably August 3) approximately one week after Dawn Hamilton's murder.[7] Bloodsworth, who looked "sick" and "depressed", told Orr that the "terrible thing" Bloodsworth had done was

---

**6.** Bloodsworth did not testify in his second trial, the case *sub judice*.

**7.** In *Bloodsworth I*, 307 Md. at 186–187, 512 A.2d 1056, the Court of Appeals ruled that certain testimony, if contemporaneous with what Bloodsworth told Rose Carson, could be used to explain what Bloodsworth meant by his having done a "terrible thing".

that "he left his wife and quit his job." [8]

■ Later, over objection, the State was allowed to present, as rebuttal evidence, Bloodsworth's testimony from his first trial. At that trial he testified that he told Birdie Plutschak, his mother-in-law, that the "terrible thing" he had done was his failure to take his wife, Wanda, out "to get a taco salad" and "pay these bills". In surrebuttal, during the second trial, Birdie Plutschak, a defense witness, testified that Bloodsworth told her that the "terrible thing" he had done was that "he had stayed out all night, spent his paycheck and had broke a promise to Wanda to take her out to dinner" and that he had quit his job and did not intend to go home.

Addressing Bloodsworth's relevancy argument first, it is clear that, within the context of the foregoing, the "terrible thing" was relevant and that Bloodsworth's former testimony was also relevant as to what he said the "terrible thing" was. "Evidence is relevant if it has any tendency to make existence of a material fact more probable or less probable than it would be without the evidence. A material fact is a fact that is of legal consequence to the determinative issues of the case." McClain, *Maryland Evidence*, § 401.1 at 261.

In *Farley v. State*, 3 Md.App. 584, 587, 240 A.2d 296 (1968), we said:

> Evidence need not be positively connected with the accused or the crime in order to render it admissible where there is a probability of its connection with the accused or the crime. . . .

*See generally Kennedy v. Crouch*, 191 Md. 580, 585, 62 A.2d 582 (1948) (evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them); *Spriggs v. State*, 226 Md. 50, 52, 171 A.2d 715 (1961)

---

8. On objection by the State, Bloodsworth proffered that Mr. Orr's testimony was offered to "say that [Bloodsworth] said something similar to this witness [Orr], I have done a terrible thing [as was told to Ms. Carson], and they talked about it and he was going to tell him [Orr] what the terrible thing was."

(a probability of connection of proffered evidence with a crime is enough to make it admissible, its weight being for the trier of fact to evaluate); *Gray v. State,* 10 Md.App. 478, 487, 271 A.2d 390 (1970), *cert. denied,* 261 Md. 725 (1971) (real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted).

■ Bloodsworth's second and primary contention is that his former testimony was not proper rebuttal evidence. In *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445 (1977), the Court set forth the general rule regarding rebuttal evidence:

Rebuttal evidence "includes any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense." *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599, 602 (1965); *Lane v. State,* 226 Md. 81, 90, 172 A.2d 400, 404 (1961), *cert. denied,* 368 U.S. 993 [82 S.Ct. 611, 7 L.Ed.2d 529] (1962). Our cases are clear that the question of what constitutes rebuttal testimony rests within the sound discretion of the trial court, *Mayson v. State, supra* [238 Md.] at 289 [208 A.2d at 602]; *Lane v. State, supra* [226 Md.] at 90 [172 A.2d at 404], and that the court's ruling should be reversed only where shown to be both "manifestly wrong and substantially injurious." *Mayson v. State, supra* [238 Md.] at 289 [208 A.2d 602]; *Kaefer v. State,* 143 Md. 151, 160, 122 A. 30, 33 (1923); 3 J. Poe, *Pleading and Practice* § 287 (6th ed. H. Sachs 1975). [Brackets in original.]

Bloodsworth argues that what he "may have told someone else on some other occasion does nothing to explain or contradict Mr. Orr's testimony." We disagree. He offered Mr. Orr's testimony to explain what the "terrible thing" was. On rebuttal, the State offered Bloodsworth's own testimony for this same purpose. This was proper rebuttal evidence. *See generally Mays v. State,* 283 Md. 548, 553, 391 A.2d 429 (1978) (evidence is proper as rebuttal if it

explains, replies to, or contradicts any new evidence presented by the accused).

## III.

### *Suppression of Exculpatory Evidence*
and
## IV.

### *Denial of Motion for New Trial*
A.

### *Background*

Bloodsworth argues that the State violated his right to a fair trial by suppressing exculpatory evidence and that the trial court erred in failing to grant him a new trial. The same evidence forms the basis for both of these contentions.

On March 28, 1985, several days after Bloodsworth had been tried, convicted and sentenced to death in *Bloodsworth I,* Judge Hinkel, the trial judge, received a telephone call from a psychiatrist, Dr. Gene Ostrom, who is the Director of the Eastern Regional Mental Health Center. Judge Hinkel promptly notified the Baltimore County Police Department of the call. It was not until March 12, 1987, almost two years later, that the State notified Bloodsworth of the existence and substance of Dr. Ostrom's call to Judge Hinkel.[9] The following is the relevant portion of the State's letter to counsel for Bloodsworth:

This is also to inform you that after trial on March 28, 1985 Judge Hinkel received a phone call from a Gene F. Ostrom, Director of the Eastern Regional Mental Health Center, who told Judge Hinkel that on the same day as the murder David M. Rehill, d.o.b. 11/16/55, 1013 Cherlyn Road, 21221, came into the office at 3:30 p.m. and said he had done a terrible thing. Dr. Ostrom believed Rehill

---

9. The record is not clear how or when the State's Attorney's office was advised of the call.

looked like the composite made in this case. According to Dr. Ostrom, Rehill had committed prior acts of violence and had a history of alcohol and drug abuse. Rehill had been known to the clinic for seven (7) years. Dr. Ostrom felt he was capable of this crime.

The State included in its letter to counsel a photostated copy of a picture of Rehill and a copy of the police interview with Rehill. The following is the relevant portions of the police interview:

[We] advised Mr. Rehill that we were the investigators involved in the murder of Dawn Hamilton and we had been informed that Mr. Rehill resembled the composit [sic] which was made of the suspect. Mr. Rehill did in fact resemble the composit [sic] but was only 5'8" and one hundred and eighty pounds and the eye witness stated that the suspect was well over six feet and two hundred pounds and Mr. Rehill could not possibly meet these requirements. Mr. Rehill stated that he did in fact have an appointment at the Eastern Regional Health Center and it would always be in the late afternoon as he would not miss work to go to the appointments. Mr. Rehill further advised that his reason for seeing the doctor was over his drinking problem and driving. Mr. Rehill stated that he was working at several locations then due to the fact he was an apprentice in the Ironworkers Union and they would send him to several places to work, Mr. Rehill could not be sure as to the exact location he was working but stated he would try to find out and get back to the undersigned. The undersigned has not seen or heard from Mr. Rehill since the meeting in the attorney's office and the undersigned and Det. Capel have made numerous attempts to contact Mr. Rehill. The detectives assigned to this case feel that Mr. Rehill does not meet the description given by the witnesses in this case and could not have even been put in the lineup with the other suspects. Mr. Rehill allowed the undersigned to take a photograph of him while we were in the office of Mr. Psoras. [Counsel for Rehill].

On March 24, 1987, two weeks after the notification, Bloodsworth's trial began. Bloodsworth concedes that he waited "until after trial to investigate Rehill...." On April 22, 1987, after Bloodsworth had been tried and convicted but not yet sentenced, he moved for a new trial but he did not base his motion on the Rehill issue. The trial court denied the motion. It was not until June 12, 1987, the date set for sentencing, that Bloodsworth moved for a new trial based on "newly discovered evidence"; the Rehill evidence he had been supplied with before trial.[10] At this second hearing, David Rehill testified that he had previously received treatment at the Eastern Regional Medical Center. Based on Rehill's assertion of a privileged communication between himself and his psychiatrist, the trial court upheld his refusal to answer questions with reference to his activities on July 25, 1984, the date of the murder.[11]

Dr. Ostrom testified that Rehill made an unscheduled visit to the health center[12] on July 25, 1984 between 12:30 and 1:30 p.m. After waiting several hours, social worker Frances Marks saw Rehill. Ms. Marks testified that Rehill was "calm" and "oriented" and that he had come to talk about "a personal relationship" he had with a "little girl".

10. On March 23, 1987, at the pretrial motion hearing, Bloodsworth informed the trial court, for the first time, about the David Rehill matter. Bloodsworth's purpose, in his motion for exculpatory evidence, was "to compel the State ... to give me a photograph of Mr. Rehill". Bloodsworth deemed the photostated copy of Rehill's picture insufficient for the purpose of showing it "to our witnesses to see where it goes" and "so people can make an intelligent observation about the photograph". The trial court ordered the State to provide Bloodsworth with an actual photograph of David Rehill.

11. *See* MD.CTS. & JUD.PROC.CODE ANN. § 9–109 (1984 Repl.Vol. & 1987 Cum.Supp.) Bloodsworth does not dispute the validity of the trial court's ruling. Mr. Rehill also specifically refused to waive his privilege. In response to Rehill's claim of privilege, Bloodsworth moved "to compel the State to grant David Rehill full immunity and obviate any privilege he may have." The trial court denied this motion and its ruling is not at issue.

12. The health center was approximately four to six blocks from the murder scene.

Ms. Marks did not recall seeing any scratches or blood on Rehill that day. Beverly Raymond, a secretary at the health center, remembered seeing Rehill on the day of the murder and she remembered that he had fresh scratches on the right side of his face. The next day, Ms. Raymond told Ms. Marks that a composite of the suspect which she saw on a newscast "looked like Mr. Rehill." Sally Lysakoski, another secretary at the health center, testified that she saw Rehill on the day of the murder and that he appeared "calm and quiet" and she did not notice any scratches on his face.

The trial court offered the following comment on the manner in which the Rehill matter was handled by the State:

> We are not talking about every blond man in Baltimore County. We are talking about a blond man who, according to information from a Doctor Ostrom, came into the medical clinic, which is approximately ten minutes from the location of this horrible crime, on the day of the crime, without an appointment, according to a proffer of the witnesses' testimony, with scratches on his face and arms. Someone who is, as I look at him, fitting the general description of the man who was last seen with the victim in this case, and whom the police investigate, never even put in a lineup according to what I have before me, because they concluded that he didn't fit the general description given by the two boys who last saw the little girl before she disappeared. Now, I look at that man and I look at that defendant, and to conclude conclusively that they do not look alike, sufficiently to at least put him in a lineup, is surprising if not more than surprising to this judge. I remember the eyes testified to by the little boy. I look at the defendant and I look at Mr. Rehill. I look at the size testified. The blond hair testified. Quite frankly, Mr. Pulver [Assistant State's Attorney], it gives me pause. For the police to conclude on their own that this information did not even warrant a lineup is shocking to me. (Bracketed material added.)

Nevertheless, the trial court denied Bloodsworth's motion for a new trial on the basis that the evidence presented was not "newly discovered" and because Bloodsworth had failed in pursuing the David Rehill issue with "due diligence". In regard to the State's delay in disclosing the Rehill information (twelve days before trial) the court noted, "[t]his court was considerate of defense motions in this case with respect to discovery and would have been equally considerate of any requests for continuance in advance of this trial...."

### B.

### *Suppression Under Brady*

Bloodsworth argues that the State's "belated disclosure" of the information regarding David Rehill constituted a "suppression of 'material evidence exculpatory to an accused [and] is a violation of due process.'" *Bloodsworth I,* 307 Md. at 175, 512 A.2d 1056, *quoting Brady v. State,* 226 Md. 422, 427, 174 A.2d 167 (1961), *aff'd,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Bloodsworth argues that "the delay in disclosing the material is so egregious as to give this Court grounds for dismissing the charges against appellant and barring the State from further prosecution of the case against him." Bloodsworth also argues that the State violated Rule 4–263(e)[13] in failing to disclose the information concerning Rehill in a timely fashion.

In response, the State argues that the issue of the timeliness of the State's disclosure under Rule 4–263(e) was not argued to the trial court and was not preserved for our review under Rule 1085. We agree. We can find no indication that the timeliness issue was either argued or

---

**13.** Rule 4–263(e) states in pertinent part:
 **(e) Time for Discovery.**—The State's Attorney shall make disclosure pursuant to section (a) of this Rule within 25 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213.

decided by the trial court. We hold that the issue was not preserved for our review under Rule 1085.[14]

The State argues that its *disclosure* of the Rehill matter, albeit 12 days before trial, was not a suppression of evidence under *Brady v. State, supra.* Given the parties respective arguments and the undisputed facts, the issue, as a matter of constitutional law under *Brady,* involves the length of the State's delay in making the mandatory disclosure of the Rehill evidence and whether that delay from March 28, 1985, until March 12, 1987, twelve days before trial, amounted to a violation of Bloodsworth's due process right to a fair trial.[15] Bloodsworth concedes that he could have asked the trial court for a postponement to allow for his further investigation into the Rehill matter but that he chose not to do so. Bloodsworth does not cite, and our independent research has failed to uncover, a case which holds that a disclosure by the State or by the prosecuting authority of *Brady* material very near the time of trial constitutes a "suppression". *E.G. Tobias v. State,* 37 Md. App. 605, 617–634, 378 A.2d 698, *cert. denied,* 281 Md. 745 (1977); *Green v. State,* 25 Md.App. 679, 699–703, 337 A.2d 729, *cert. denied,* 275 Md. 749 (1975); *2 Wharton's Criminal Procedure* § 386 (C. Torcia, 12th ed. 1975 and 1987 Cum.Supp.); Annotation, Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction, 34 A.L.R.3d 16 (1970 and 1987 Supp.); *The Prosecutor's Constitutional Duty to Reveal Evidence to the De-*

---

**14.** In his reply brief, Bloodsworth argues that "[t]he nature of nondisclosure defies application of the requirements of Rule 1085." Bloodsworth urges that his "due process challenge to the timing of the State's disclosure is preserved and subject to review by this Court." We agree that Bloodsworth's constitutional challenge is preserved, but his failure to argue to the trial court the lack of timely disclosure under Rule 4–263 constitutes a waiver of any argument he may have had under that rule.

**15.** The State does not argue that the Rehill matter was not exculpatory evidence under *Brady* and thus not subject to the mandatory disclosure requirement.

*fendant,* 74 Yale L.J. 136 (1964).[16] We hold that after the State's disclosure, Bloodsworth's failure to seek a postponement, at a time when he knew or should have known about the importance of the Rehill matter to his defense, amounts to a waiver of any due process complaint which Bloodsworth may have had.

## C.

### *"Newly Discovered Evidence"*

■ Bloodsworth makes a three pronged attack on the trial court's denial of his second motion for a new trial. First, Bloodsworth argues that the trial court failed to "recognize, much less exercise, the discretion vested in the trial court to grant a motion for new trial" under Rule 4–331.[17] Second, he argues that the trial court erred in

---

**16.** We cite these authorities as examples in which *Brady* and its progeny were discussed at length but wherein the issue of the timing of the disclosure before trial is neither discussed nor considered as a pertinent issue. We believe that the timing issue would have been discussed in these cases, if any, and thus its absence serves to prove the negative, i.e., that late disclosure is not a *Brady* violation.

**17.** Rule 4–331 states in pertinent part:
 (a) **Within Ten Days of Verdict.**—On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.
 (b) **Revisory Power.**—The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:
 (1) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;
 (2) in the circuit courts, on motion filed within 90 days after its imposition of sentence.
 Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.
 (c) **Newly Discovered Evidence.**—The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
 (1) in the District Court, on motion filed within one year after its imposition of sentence if an appeal has not been perfected;
 (2) in the circuit courts, on motion filed within one year after its imposition of sentence or its receipt of mandate issued by the Court of Appeals or the Courts of Special Appeals, whichever is later.

finding a lack of due diligence and that the evidence was not newly discovered. Lastly, Bloodsworth argues that the trial court erred in failing to consider the State's lack of diligence in disclosing the Rehill matter.

The State responds that Bloodsworth failed to argue to the trial court any basis for a new trial other than "newly discovered evidence" and therefore the other issues raised are not preserved for our review. Our review of the record confirms the State's argument. Bloodsworth's new trial motion proceeded solely upon the basis of "newly discovered evidence" under Rule 4–331(c), and our review is limited to that issue. Rule 1085.

In his disposition of the motion the trial judge said:

As a result, I only reach the first two prongs of the newly discovered evidence test. That is that it in fact is newly discovered and that due diligence in pursuing it was made on behalf of the movant, and I find that is not the case here. I find that what has been presented to this court is not newly discovered, and the motion for new trial will consequently be denied.

In *Jones v. State,* 16 Md.App. 472, 477, 298 A.2d 483, *cert. denied,* 268 Md. 750 (1973), we said:

On the question of newly or after discovered evidence, it has been said:

"There must ordinarily be present and concur five verities, to wit: (a) *the evidence must be in fact, newly discovered, i.e., discovered since the trial;* (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *Johnson v. United States,* 32 F.2d 127, 130 [8th Cir.1929]. See also *Mills v. United States,* 281 F.2d 736, 738 [4th Cir.1960].

It is essentially the function of the trial judge to evaluate and assess the newly discovered evidence and where such evidence consists of testimonial evidence from a witness allegedly discovered after the trial has been concluded, it is for the trial judge to determine the materiality and the credibility of such testimony. Unless it should appear that the trial judge's findings of fact were wholly unsupported by the record and, thus, clearly erroneous, his findings will not be disturbed on appeal.

*See also Brittingham v. State,* 63 Md.App. 164, 184, 492 A.2d 354 (1985), *rev'd on other grounds,* 306 Md. 654, 511 A.2d 45 (1987). In the case *sub judice,* the fact that the State disclosed the evidence *prior to trial* is dispositive. The evidence was not "newly discovered" because that definition requires that the evidence be discovered *since the trial.* Furthermore, the fact that Bloodsworth chose not to seek a postponement, given the circumstances and the gravity of his case, demonstrates a lack of "due diligence". There was no error in denying the motion for a new trial. *Jones,* 16 Md.App. at 479, 298 A.2d 483; *Brittingham,* 63 Md.App. at 185, 492 A.2d 354.

### V.

### *Other Crimes*

Bloodsworth argues that the trial court admitted, on two separate occasions, inadmissible evidence that he had bought "drugs" and smoked "marijuana". Bloodsworth bases his inadmissibility argument on the fact that the "other crimes" evidence had no recognizable exception, *see Ross v. State,* 276 Md. 664, 669–670, 350 A.2d 680 (1976), and that it was irrelevant to the issues in the case.

The State responds that in both instances the trial judge gave an appropriate curative instruction sufficient to correct the error. By so arguing the State concedes that the evidence was generally inadmissible under *Ross, supra.*

In *Wilhelm v. State,* 272 Md. 404, 423–424, 326 A.2d 707 (1974), the Court of Appeals said:

When in the first instance the remarks of the State's Attorney do appear to have been prejudicial, a significant factor in determining whether the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused is whether or not the trial court took any appropriate action, as the exigencies of the situation may have appeared to require, to overcome the likelihood of prejudice, such as informing the jury that the remark was improper, striking the remark and admonishing the jury to disregard it. When such action has been taken by the trial court and found to have been sufficient by the reviewing court, judgments have not been reversed. (Citations omitted.)

The logic of *Wilhelm* applies equally to the case *sub judice*. The curative instructions [18] given by the trial court with respect to the inadmissible evidence was sufficient to attenuate adequately any prejudice that Bloodsworth may have suffered. *See generally Blackwell v. State,* 278 Md. 466, 482, 365 A.2d 545 (1976), *U.S. cert. denied,* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977) (even if prosecutor's remarks were improper, the possibility of prejudice was cured by the courts instruction); *Brooks v. State,* 68 Md. App. 604, 613, 515 A.2d 225 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987) (defendant is entitled to a fair trial not a perfect one; when curative instructions are given it is presumed that the jury can and will follow them).

## VI.

### *Hearsay*

■■■ Bloodsworth argues that the State was permitted, through the testimony of Detective Capel, to introduce inadmissible hearsay evidence about the identifications

---

**18.** The court gave the jury the following instructions:
Mr. Foreman and ladies and gentlemen of the jury, I am instructing you to disregard the Detective's comment with regard to the defendant buying drugs and I am instructing you that has no relevancy or bearing whatsoever on the defendant's guilt or innocence in this case. And my instructions in this regard are binding upon you.

made by Christian Shipley and Jackie Poling. Bloodsworth argues that Detective Capel impermissibly testified that Christian said: (1) that he was dissatisfied with the composite sketch of Bloodsworth he had helped to create because Bloodsworth's hair was "bushier" and his "eyes were weird", two qualities the composite sketch did not contain; (2) that Bloodsworth's hair in a photograph "looked redder than he saw. He said it was sandier when he saw it."; and (3) that Christian initially described the man he saw at the pond as six feet, five inches tall.

Bloodsworth's hearsay argument also includes the following testimony of Detective Capel about Jackie Poling's statement which dealt with his misidentification during the police line-up of the man he saw at the pond:

Q Now, Detective, if you would read what Jackie said to you at that time?

A Yes. Jackie, how old are you? And Jackie's answer was 8. Did you attend a lineup at Baltimore County Police Headquarters on August 13, 1984? Yes. Who was with you in the lineup room? My Mom. Did you make an identification at the lineup? And Jackie answered, yes, number three. Question, was that the right person you saw at the pond with Chris who went with Dawn? Answer, no. I picked the wrong person because I was afraid. But I told my Mom later that night when we got home that it was really number 6. Question, did anyone tell you it was number 6 prior to you getting home? His answer was no. Question, you knew number 6 was the man you saw at the pond and the man you saw take Dawn in the woods? Yes. Do you wish to add anything to this statement? No. And then Jackie signed it and Detective Ramsey and I signed it as witnesses.

The State argues that the evidence was properly admitted, as an exception to the hearsay rule, because Detective Capel's testimony was offered "so that the jury could better assess the reliability" of Christian's and Jackie's identification evidence.

In *Bedford v. State*, 293 Md. 172, 176–177, 443 A.2d 78 (1982), the Court of Appeals said:

As pointed out by Justice Hennessey for the Supreme Judicial Court of Massachusetts in *Commonwealth v. Swenson*, 368 Mass. 268, 272, 331 N.E.2d 893 (1975), an extrajudicial identification made by a witness may be offered in evidence for three possible purposes: (1) for corroboration; (2) for impeachment; or (3) as substantive evidence of an identification, having probative value. In *Johnson v. State*, 237 Md. 283, 206 A.2d 138 (1965), this Court was presented with the issue of whether testimony concerning an extrajudicial identification might be received as substantive evidence. There identification was made at a lineup. Judge Horney said for the Court:

"We hold therefore that where, as here, the identifying victims or eyewitnesses were present and subject to cross-examination, the testimony of the police officer as to the extrajudicial identifications was admissible."

In *Mouzone v. State*, 294 Md. 692, 701–702, 452 A.2d 661 (1982), cited by Bloodsworth, the Court of Appeals said:

Finally, the State contends that Byrd's statement is admissible as a prior extrajudicial identification. It is true that the Court in *Basoff v. State*, 208 Md. 643, 119 A.2d 917 (1956) held that an extrajudicial identification is admissible as an exception to the hearsay rule where the identification was such as to preclude any suspicion of unfairness or unreliability. We reaffirmed that holding recently is *Bedford v. State*, 293 Md. 172, 443 A.2d 78 (1982). However, we did not hold that a statement containing an extrajudicial identification and also other hearsay evidence falling under no exception would be admissible at trial.

We believe our observation precludes the statement from being admitted; it simply contained too much. The statement Byrd gave to Danko asserted that Byrd had witnessed the killing; that she had seen the killer; that

he had run past her and in a specific direction; that he was of a particular height and build and wore certain described clothing; that she had selected a particular photograph as being a picture of the man she saw running from the scene of the crime; and that the statement was true and correct. Byrd's statement contained much more than an identification and was thus beyond the scope of this exception.

We hold, therefore, that, since Byrd's statement was hearsay that did not fall within any exceptions to the hearsay rule, it was error for the trial judge to admit the statement as substantive evidence of guilt.

*Mouzone* may be distinguished from the case *sub judice* in that Ms. Byrd, although called to the stand to testify, could not present independent evidence of the facts contained in her statement. In the case *sub judice,* both Christian Shipley and Jackie Poling presented independent evidence of the disputed facts. In this sense, the admission of the evidence, if error at all, was cumulative and harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

In the case *sub judice,* all of the disputed testimony relates directly to the identification of Bloodsworth and all of the witnesses "were present and subject to cross-examination." We hold there was no error in admitting the evidence.

## VII.

### *Limitation of Evidence of The Second Composite Sketch*

Bloodsworth argues that the trial court erred in preventing Detective Capel from being cross-examined on the circumstances surrounding the creation and disposition of a second composite picture of the suspect made with the assistance of Faye McCullough.

At trial, on cross-examination, Detective Capel was asked whether there was another composite made of the suspected killer. The detective replied in the affirmative. The trial court sustained the State's objection and refused to allow Bloodsworth to ask the detective what had become of the second composite. Bloodsworth proffered that Ms. McCullough, who had not then testified, would say that Detective Capel "became angry that her composite didn't match the composite that Shipley has given, so he said to her we are going with the little boys and threw her composite away." The trial court, however, reserved its ruling on whether it would allow Bloodsworth to recall Detective Capel for cross-examination until after Ms. McCullough had testified.

Faye McCullough testified on behalf of Bloodsworth that on the day of the murder, at approximately 6:15 a.m., when she was driving down Fontana Lane, near the murder scene, she noticed a "guy", matching the suspect's general description, "standing out in the middle of nowhere." Later that night, when Detective Capel and another officer visited Ms. McCullough in her home, she helped to create a composite. Ms. McCullough testified, however, that once the sketch was finished she told the police, "it didn't look like the man that I saw." Bloodsworth did not ask the trial court to recall Detective Capel.

The State contends that under these circumstances, Bloodsworth's right of cross-examination was not improperly curtailed. We agree. *See generally State v. Cox,* 298 Md. 173, 183, 468 A.2d 319 (1983) (The right to cross-examine is not absolute and may be restricted by the trial judge in the exercise of sound discretion); *Waldron v. State,* 62 Md.App. 686, 696, 491 A.2d 595, *cert. denied,* 304 Md. 97, 497 A.2d 819 (1985) (allowance of questions on cross-examination is normally reserved for the sound discretion of the trial judge and will not normally be disturbed absent an abuse if discretion). We hold that there was no abuse of discretion.

## VIII.

### *Richard Gray As Court's Witness* [19]

Bloodsworth argues that the trial court erred in denying his request that the court call Richard Gray as a "court's" witness and in requiring him to call Gray as a hostile witness. From our review of the record it appears that what the court did was to create a "hybrid" of sorts since it told Bloodsworth to call Gray "as a hostile witness, without the necessity of laying any testimonial foundation for his hostility, with the right to lead, cross-examine, impeach and no vouching for the veracity of the witness." Without commenting on the propriety of the trial court's novel procedure, we note that Bloodsworth said, "I have no problem with that at all, sir." Given Bloodsworth's consent, he cannot now be heard to argue that it was error. Rule 1085.

## IX.

### *Photographic Evidence of Gray's Shoe* [20]

On the basis of relevance, Bloodsworth claims that the trial court erred in admitting, during the rebuttal portion of the State's case, a photograph of the sole of one shoe worn by Richard Gray on the day of the murder. The purpose was so that the jury could compare the pattern of that sole with one which the medical examiner previously found on the victim's neck and which he compared with that on "running type shoes" and on "some car mats." The State replies that the photograph was relevant to rebut Bloodsworth's implication that Gray was the killer. Bloodsworth concedes that his strategy was "to try to convince

---

**19.** The police investigated Richard Gray for his possible connection to the case *sub judice* but, ultimately eliminated him as a suspect. *See Bloodsworth I,* 307 Md. at 171–176, 512 A.2d 1056, for a detailed exegesis of Gray's importance to the Bloodsworth defense.

**20.** This is a different shoe than the shoes at issue in *Bloodsworth I,* 307 Md. at 176–177, 512 A.2d at 1056.

the jury that Mr. Gray was more likely the killer than appellant."

In *Leeson v. State,* 293 Md. 425, 433–434, 445 A.2d 21 (1982), the Court quoted from *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976):

> "The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as *evidence which has a natural tendency to establish the fact at issue.*' [O]ur predecessors stated it to be 'an elementary rule that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them' " *Dorsey,* 276 Md. at 643, 350 A.2d at 668–69. [Citations omitted and emphasis added in *Leeson.*]

In the case *sub judice,* the disputed evidence had a natural tendency to rebut Bloodsworth's strategy that Gray was the killer because the pattern on Gray's shoe did not match the pattern on the victim's neck. In this context, the evidence was relevant. The fact that the evidence could not conclusively absolve Gray does not detract from its relevancy.

## X.

### *The "Tip"*

Bloodsworth argues that the trial court erred in admitting, over his objection, the following testimony from Detective Capel:

Q. Now, what did you tell the defendant when he, when you first interviewed him, why you were there?

A. We told him we were investigating the murder of Dawn Hamilton and that through a tip he came up as a suspect.

In *Cain v. State,* 63 Md.App. 227, 232, 492 A.2d 652, *cert. denied,* 304 Md. 300, 498 A.2d 1186 (1985), we said that hearsay is defined as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the

credibility of the out-of-court asserter." *Id., quoting Houck v. DeBonis,* 38 Md.App. 85, 90, 379 A.2d 765, *cert. denied,* 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977), quoting from *McCormick on Evidence* § 246 (2d ed. 1972).

In *Purvis v. State,* 27 Md.App. 713, 718, 343 A.2d 898 (1975), we quoted with approval the following from C. McCormick, Evidence § 248 at 587 (2d ed. 1972):

"In criminal cases, the arresting or investigating officer will often explain his going to the scene of the crime or his interview with the defendant, or a search or seizure, by stating that he did so 'upon information received' and this of course will not be objectionable as hearsay, *but if he becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay."* (Emphasis in *Purvis;* footnotes omitted in *Purvis.*)

In *Purvis* at 725, 343 A.2d 898, we reversed the conviction of that defendant because a police officer was allowed to testify to the following:

A Well, I was introduced to the defendant by an S.E.

Q Well, they don't know what S.E. is.

A An S.E. is a paid informant. On the 1st of November, 1973 about 5:00 P.M., Detective Holly and myself met S.E. 1–3–X539, advised that a subject by the name of Slim was selling heroin in the South Baltimore area. With this we drove in an official government vehicle to a public telephone to the Northeastern District. We called Edward Purvis and advised him I wanted to purchase heroin at approximately 5:30.

Mr. COLEMAN: If your Honor please, I would object.

*Id.* at 715, 343 A.2d 898. We held that:

The response by Detective Strickland submitted to the jury the out-of-court declaration of his numerically identified informant that one "Slim" was engaged in selling heroin in the South Baltimore area and that the appellant, Purvis, was "Slim." The fact that Purvis was a seller of heroin was the very object which the prosecution had

undertaken to establish and did so solely on the basis of the testimony of Detective Strickland and his colleagues. The statement which Detective Strickland attributed to his informer became evidence by a third person, an out-of-court declarant, who was not subject to cross-examination and who did not confront the appellant that Purvis was factually a seller of narcotics, whose operation was centered in the South Baltimore area and that he had indeed sold them to this unidentified individual.

. . . . .

As we see it, the statement was of misleading probative force which tended to influence the trier of facts to believe that before Purvis' contact with the officers he was already a dealer in heroin and thus more likely to have sold the drug to the detectives as charged.

*Id.* at 724–725, 343 A.2d 898. *See also* our discussion of *State v. Kimble,* 214 La. 58, 36 So.2d 637 (1948) 27 Md.App. at 721, 343 A.2d 898 and of *State v. Bankston,* 63 N.J. 263, 307 A.2d 65 (1973), 27 Md.App. at 722, 343 A.2d 898 contained in *Purvis.*

 In the case *sub judice,* Detective Capel never revealed what the substance of the "tip" was. The detective's testimony was not inadmissible hearsay. The court did not err in admitting the evidence. *Cf. Platt v. State,* 402 S.W.2d 898, 900 (Tex.Crim.App.1966), *cert. denied,* 386 U.S. 929, 87 S.Ct. 875, 17 L.Ed.2d 801 (1967) (officer's testimony that he received information from an informer but which did not reveal the content of that information, was not hearsay); *Locke v. State,* 169 Tex.Cr.R. 361, 334 S.W.2d 292, 293 (1960) (officer's testimony that he received information from a reliable source, without revealing the substance of the information, was not hearsay)

## XI.

### *Improper Closing Argument*

 Finally, Bloodsworth claims that the following closing argument by the State constituted improper comment on his failure to testify:

So, let's look at what that evidence is. First of all, the State has brought before you all five eyewitnesses who placed the defendant at Fontana Village on July 25, 1984. Now, why is that significant? Well, it is significant because the defendant denies ever having been there. Now, these five people—

The State argues that it is proper to comment on "the question in issue and the evidence relating thereto adduced at the trial and such inferences, deductions, and analogies as can be reasonably and properly drawn therefrom...." *Wilhelm, supra,* 272 Md. at 438, 326 A.2d 707. The State contends that its comments were based on facts already in evidence, *i.e.* the testimony of the eyewitnesses who placed Bloodsworth at the scene and Bloodsworth's statement to police that he had never been to the place of the murder. We agree.

In *Wilhelm,* 272 Md. at 429, 326 A.2d 707, the Court said:

In considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of unfairly creating prejudice against the defendant, recognition must be given to the fact that the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and asses—in the context in which the remarks are made and their relationship to other factors in the trial—whether they were in fact prejudicial. *Cook v. State, supra* [225 Md. 603, 171 A.2d 460 (1961)]; *Lusby v. State,* 217 Md. 191, 195, 141 A.2d 893, 895 (1958).

The Court also stressed that

[w]hile arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings,

> assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions. *See* 53 Am.Jur. *Trial* § 463 (1956).

*Id.* at 413, 326 A.2d 707. *See also Sanders v. State,* 66 Md.App. 590, 602, 505 A.2d 557, *cert. denied,* 306 Md. 370, 509 A.2d 134 (1986). We do not construe the prosecutor's comments as an attack on Bloodsworth's failure to testify. *See generally Griffin v. California,* 380 U.S. 609, 614–615, 85 S.Ct. 1229, 1232–1233, 14 L.Ed.2d 106 (1965) (prosecution in criminal case is not permitted to comment on accused's failure to testify). We hold that there was no error in allowing the State's argument.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.